## IN RE KATIA M.*
### (AC 31672)

Bishop, Lavine and Foti, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 1—officially released October 26, 2010

*Elizabeth Knight Adams*, for the appellant (respondent father).

*John E. Tucker*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman* and *Erik T. Lohr*, assistant attorneys general, for the appellee (petitioner).

*Judith Dayner*, for the minor child.

*Opinion*

LAVINE, J. The respondent father appeals from the judgment of the trial court terminating his parental rights with respect to his minor child for failure to achieve a sufficient degree of personal rehabilitation within the meaning of General Statutes § 17a-112 (j) (3).[1] On appeal, the respondent claims that several of the court's factual findings were clearly erroneous, specifically that (1) he was unwilling or unable to benefit from reunification services in light of his incarceration,

---

[1] The parental rights of the child's mother were terminated by consent pursuant to § 17a-112 (i). The respondent mother is not a party to this appeal, and in this opinion we refer to the respondent father as the respondent.

(2) the department of children and families (department) had made reasonable efforts to reunify the family and (3) he had failed to achieve sufficient rehabilitation. We affirm the judgment of the trial court.

The record discloses the following procedural history. The petitioner, the commissioner of children and families, filed a neglect petition on April 24, 2006, and the child was adjudicated neglected on June 1, 2006. The child was allowed to remain with her mother under an order of protective supervision until the petitioner filed a motion for an order of temporary custody on behalf of the child on July 28, 2006, which was sustained on August 4, 2006. The respondent agreed to the order of temporary custody. The respondent signed court-ordered steps on August 16, 2006.[2] On September 21, 2006, the child was committed to the custody of the petitioner, who filed a petition to terminate the parental rights of the respondent, pursuant to § 17a-112 (j) (3) (B) (i),[3] in March, 2009.

[2] The respondent was ordered to comply with the following steps: keep all appointments set by department personnel, keep the child's whereabouts and *his whereabouts* known to the department, participate in counseling and make progress toward identified treatment goals: parenting and individual, submit to substance abuse assessment and recommendations regarding treatment, submit to random drug testing, *cooperate with court-ordered evaluations, sign releases authorizing the department to communicate with service providers* (the recommended service providers for parenting and individual counseling and substance abuse assessment/treatment were to be determined), secure and maintain adequate housing and legal income, no substance abuse, notify the department of changes in the composition of his household, maintain the child in Connecticut and visit with the child as often as the department permits. The respondent signed the ordered steps on August 16, 2006.

[3] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition . . . if it finds by clear and convincing evidence that . . . (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child,

Following a trial held on September 23, 2009, the court made the following findings of fact as set forth in its memorandum of decision. The child's mother has been known to the department since 1999 when she tested positive for cocaine at the birth of another, older child. The mother's problems with respect to the child at issue were the lack of a safe living environment and parenting skills plus unresolved mental health and substance abuse issues. The respondent's problem was lack of involvement in the child's life due to his incarceration.

The mother tested positive for cocaine on two occasions within one month of the child's birth. Although the child was born on February 17, 2006, the department was unaware of her birth until February 28, 2006, when the mother was discharged from the Liberations Substance Abuse Inpatient Program. Department personnel attempted to visit with the mother and child but were unable to locate them until March 1, 2006. Arrangements were made for the child to reside with a paternal aunt until the mother began substance abuse treatment and tested negative for drugs. On March 20, 2006, the child and the mother were placed at Coventry House, but were discharged on April 16, 2006, due to the mother's noncompliance. The two, however, were readmitted to Coventry House on April 17, 2006. The mother and child again were discharged from Coventry House on June 23, 2006, due to the mother's noncompliance. The mother and the child resided with a maternal aunt until July 25, 2006, when they moved to the home of the child's maternal grandfather. The department placed a ninety-six hour hold on the child due to her mother's transient lifestyle and substance abuse. See General Statutes § 17a-101g. The child was placed with her maternal aunt during this period. On March 3, 2007,

such parent could assume a responsible position in the life of the child . . . ."

the child and her mother were placed at the Morris Foundation. The mother was discharged from that program on April 10, 2007, and she and the child returned to the home of the maternal aunt. On May 3, 2007, the mother and the child moved into their own apartment in Hartford but were evicted shortly thereafter. They returned to the home of the maternal aunt until mid-December, 2007, when the mother moved into an apartment with a friend. On January 8, 2008, the child again was staying with her maternal aunt due to her mother's homelessness. The child was removed from the home of her maternal aunt due to the aunt's health issues. The child was placed in a licensed foster home, where she continuously resided through the time of the trial.

The court found that the respondent began to abuse substances when he was in his early teens and claimed to be "hooked" after his first use. He started to use cocaine when he was twenty-one. Although he attended Hartford public schools, he did not graduate but obtained his graduate equivalency diploma while he was incarcerated. The respondent and the child's mother never married but are also the parents of a son, who is older than the child at issue.

The respondent's criminal history dates to 1981 and includes charges of sale of illegal drugs, intent to sell or dispense drugs within 1500 feet of a public housing project, operating a drug factory, driving under the influence of alcohol, possession of narcotics, violation of probation, burglary in the third degree, criminal mischief in the second degree, interfering with a police officer and resisting arrest, larceny in the sixth degree, possession of burglary tools and assault on a police officer. The respondent again was incarcerated on January 25, 2006, on federal drug charges.

According to department records, the respondent needed to address his initial substance abuse problems

and to demonstrate an awareness of the child's emotional well-being and associated needs.[4] The respondent also needed to establish a relationship with the child, whom he last saw in 2007. The court found that he has been incarcerated for a long period of time, would remain in prison until at least April 14, 2010, and was not in a position to provide for the child full-time.

The respondent participated in an administrative case review via telephone from the federal correctional institution in Cumberland, Maryland (federal prison), on June 24, 2009. At that time, the respondent reported that he maintains good behavior, that he is participating in a ten week parenting class that has seven or eight more weeks remaining and that he was going to begin an inpatient substance abuse treatment program. The respondent stated that he wanted his sister and his niece to be considered as placement options for the child. Those relatives, however, previously had been evaluated by the department and were not able to meet the licensing criteria. The respondent participated in the trial telephonically from the federal prison.

---

[4] In the department's April 24, 2006, summary of facts for the neglect petition, the department reported that the respondent was uncertain that he was the child's father and requested a paternity test. The court ordered a paternity test that confirmed that the respondent is the father of the child.

In the department's May 23, 2006, social study for the court, the respondent denied ever being married. At the time the mother reported being pregnant with their first child, the respondent told department personnel that he was dating another woman. At the time of his current incarceration, the respondent stated that he was in a relationship with that woman. At trial, the respondent testified that the woman who had been living in his apartment with him was a heroin addict.

In an affidavit dated July 27, 2006, department social worker Kenny Adom attested that the mother had a history with the department dating to 1999. On October 30, 2004, the mother gave birth to a child, fathered by the respondent, who tested positive for illegal substances at birth. Adom further attested that since the birth of the child at issue in this case to the date of the affidavit, the mother had lived a transient lifestyle and that the respondent was incarcerated and had not provided a plan for the care, welfare and safety of the child.

Following trial, the court found by clear and convincing evidence, presented through department social studies, that the respondent had yet to achieve a sufficient "level of rehabilitation . . . which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his child's life]." (Internal quotation marks omitted.) *In re Sarah Ann K.*, 57 Conn. App. 441, 448, 749 A.2d 77 (2000). At the time the child was adjudicated neglected, the respondent's problems were incarceration and substance abuse. The court found that the respondent had not complied with the following court-ordered steps; see footnote 2 of this opinion; the respondent was not available to submit to substance abuse assessment and follow recommendations regarding treatment; he was not available to submit to random drug testing; the respondent has not participated in services and followed the recommendations of service providers. The court found that due to his incarceration, the respondent did not have adequate housing. The court also found that the respondent would not be able to assume a responsible position in the life of the child within a reasonable time. The court concluded that the respondent, therefore, had failed to achieve a sufficient degree of personal rehabilitation pursuant to § 17a-112 (j) (3) (B) (i).

The court also found that the child has adjusted well to the foster home where she has lived since January 11, 2008. She attends preschool and interacts with other children. She has a routine with her foster parents and shows them a lot of affection by frequently hugging and kissing them. There are other foster children in the foster home, and the child has bonded with them. The child is healthy and on target developmentally. The foster parents are committed to adopting the child, should that option become available.

The court also made the findings required by § 17a-112 (k), by clear and convincing evidence, that are relevant to the respondent's claim in that they clarify the

court's decision. The department could have made reasonable efforts to reunify the child with the respondent, and services could have been ordered in a timely manner and would have been appropriate for the circumstances at hand. The respondent, however, was unable or unwilling to benefit from reasonable reunification efforts. His serious issues clearly and convincingly make him unable or unwilling to benefit from reasonable reunification efforts.[5] The respondent has not been able to take full advantage of services available, as he has been incarcerated for most of the current involvement of the department. The respondent is unable or unwilling to benefit from reunification services contemplated by the federal Adoption Assistance and Child Welfare Act of 1980, as amended. Department personnel made reasonable efforts to maintain contact with both parents.

The respondent failed to comply with the court-ordered steps, as he has been incarcerated for much of the time and because he has not been available much of the time, the child was unable to bond with him. At the time of trial, the child was three years and eight months old. Moreover, the court found that the respondent did not make realistic and sustained efforts to

_____

[5] Pursuant to Practice Book § 10-33 the petitioner claims that the respondent's first claim may be moot, arguing that the court's finding the respondent has serious issues is a second finding sufficient to conclude that he was unwilling or unable to achieve sufficient rehabilitation. In his appeal, the respondent did not claim that this finding by the court was clearly erroneous. The petitioner has argued that to prevail on appeal, the respondent must successfully attack both findings or his "unable or unwilling" claim is moot, citing *In re Jorden R.*, 293 Conn. 539, 554–55, 979 A.2d 469 (2009) (where court makes both § 17a-112 (j) (1) findings that reasonable efforts were made and parent unwilling or unable to benefit from reasonable efforts, failure to challenge both findings on appeal implicates subject matter jurisdiction). We conclude that the court's finding that the respondent had serious issues is not a separate and distinct finding but integral to its conclusion that the respondent failed to achieve sufficient rehabilitation due to his lack of availability.

conform his conduct to minimally acceptable parental standards. He refused to cooperate with department personnel. He failed to make the changes necessary in his life that would indicate that he would be a safe, responsible and nurturing parent for the child. The court found that to permit the child to be cared for by him would compromise her safety.

The court also found by clear and convincing evidence that no unreasonable conduct by department personnel, the foster parents, department of correction personnel or third parties prevented the respondent from maintaining a relationship with the child, nor did his economic circumstances prevent such relationship, although the limitations and restrictions inherent in the foster care system remained in effect. The respondent maintained little contact with the child and the petitioner. To improve his parental bond with the child, the respondent is in need of adequate parenting classes and significant visitation with the child. Because he remains incarcerated, time will not permit the necessary compliance.

Additionally, the court found by clear and convincing evidence that termination of the respondent's parental rights as to the child would be in her best interest. In doing so, the court examined multiple relevant factors, including the child's interest in sustained growth, development, well-being, stability and continuity of her environment, her length of stay in foster care, the nature of her relationship with her biological parent and the degree of contact maintained by her biological parent. The court balanced the child's intrinsic need for stability and permanency against the benefits of maintaining a connection with the respondent. The court concluded that it is not in the child's best interest to continue to maintain any legal relationship with the respondent, who has failed to gain insight into becoming a safe, nurturing and responsible parent. His judgment and

conduct remain questionable and has not improved since the child has been in the custody of the petitioner.

The court found clear and convincing evidence of the child's pressing need for permanence and stability. The respondent would need "much" time to show that he has forsaken substance abuse, addressed his issues, undertaken the necessary counseling and succeeded in it, established himself in the community and shown that he was capable of being a safe, nurturing and responsible parent for the child. The court found that the child cannot afford the delay with respect to her need for permanency, noting that "long-term stability is critical to a child's future health and development . . . ." (Citation omitted.) *In re Eden F.*, 250 Conn. 674, 709, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999). Furthermore, the court noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence" when resolving issues related to permanent or temporary care of neglected children. *In re Alexander V.*, 25 Conn. App. 741, 748, 596 A.2d 934 (1991), aff'd, 223 Conn. 557, 613 A.2d 780 (1992).

The linchpin to a determination of rehabilitation, the court stated, necessarily includes a finding that the respondent can begin parenting within a reasonable period of time. The court found that the petitioner will remain incarcerated until perhaps April 14, 2010. Any reunification must wait for however long it may take him to rehabilitate himself so as to be able to provide safe and nurturing parenting to the child, attend to her developmental needs and provide her with an appropriate home. This would include a substantial period of sobriety, adequate housing, gainful employment, no further involvement with the criminal justice system and an unknown amount of therapeutic services to facilitate a relationship with this child, who well may be

two to three years older before all of those events conceivably could unfold. To allow for such further time, easily more than one year after the respondent's release, runs counter to our courts' long recognized preference for permanency. The question is not simply one of rehabilitation; it is whether the petitioner can meet the particular needs of the child within a reasonable time. See *In re Amneris P.*, 66 Conn. App. 377, 384–85, 784 A.2d 457 (2001). The court, therefore, found by clear and convincing evidence that it was in the best interests of the child to terminate the respondent's parental rights. The respondent filed this appeal.

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported." (Internal quotation marks omitted.) *In re Cheila R.*, 112 Conn. App. 582, 589, 963 A.2d 1014 (2009). "A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Jorden R.*, 293 Conn. 539, 558–59, 979 A.2d 469 (2009).

"The legal framework for deciding termination petitions is well-established. [A] hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 . . . exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Citations omitted; internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 487–88, 940 A.2d 733 (2008).

I

The respondent's first claim is that the court improperly found that he was unwilling or unable to benefit from reunification services in light of his incarceration. The respondent's claim is grounded in the principle that incarceration *alone* is not sufficient to terminate parental rights. Although we agree that incarceration alone is not a sufficient basis to terminate parental rights; see *In re Juvenile Appeal (Docket No. 10155)*, 187 Conn. 431, 443, 446 A.2d 808 (1982); incarceration nonetheless may prove an obstacle to reunification due to the parent's unavailability, which is the case here. We, therefore, disagree with the respondent's claim.

In its memorandum of decision regarding its adjudicatory findings, the court stated that the respondent "is unwilling or unable to benefit from reunification services in that he has failed to make himself available for services and has failed to be a participant in the child's life, in light of his incarceration." The respondent does

not dispute that, at the time of trial, he had been incarcerated for the child's entire life. During her lifetime, he has been in custody in Hartford, Rhode Island, New York City and Maryland. He was to remain in the federal prison until April 14, 2010, at which time he expected to be released to a halfway house in Hartford, where he could be required to stay until October, 2010. He is required to then complete three years of probation, which carries the risk of reincarceration. During the trial, the respondent asked the court to continue the matter to afford him the opportunity to reunite his family.[6]

The evidence at trial reveals that while the respondent was in custody in Hartford, department personnel arranged six visits between him and the child. When the respondent was transferred to the Wyatt prison facility in Rhode Island in October, 2007, where he remained until December, 2008, he failed to include the department on his contact list, despite the fact that the court-ordered steps required him to keep the department informed of his whereabouts. His department social worker, Carissa Silas, left telephone messages for him with his counselor, but the respondent did not return the calls. During that period of incarceration, Silas was communicating with the respondent's relatives on a monthly basis and requested that they ask him to call the department. The respondent testified that he never received any messages to call the department. The record also contains at least five letters the department sent to him at the Metropolitan Detention Center in Brooklyn, New York, and the federal prison. The respondent claimed not to have received them.

The respondent telephoned the department in March, 2009, from the Metropolitan Detention Center. At that time, he expressed disagreement with the petitioner's

---

[6] The court did not grant the respondent's request.

plan to terminate his parental rights, but he did not request visitation with the child. He also informed department personnel that he was being transferred to the federal prison, where he intended to engage in substance abuse and parenting programs.

On June 24, 2009, the respondent participated by telephone in an administrative case review during which he informed department personnel that he had to complete seven to eight more weeks of a ten week parenting program and that he intended the next day to begin a 500 hour inpatient substance abuse program. At trial on September 9, 2009, the respondent testified that "I'm in [a] 500 hour . . . drug abuse program. And I've taken up parenting classes since I've been here."[7] As the finder of fact and the arbiter of credibility, the court was free to believe all, some or none of the respondent's testimony. See *In re Jaime S.*, 120 Conn. App. 712, 729, 994 A.2d 233, cert. granted on other grounds, 297 Conn. 915, 995 A.2d 954 (2010). Moreover, the respondent testified as follows in response to a question from the petitioner's counsel:

"[The Petitioner's Counsel]: By your own choice, you were not in a position to parent Katia when she was born, correct?

"[The Respondent]: No, I wasn't in a position because at the time I was incarcerated. So, I couldn't have been in a position.

"[The Petitioner's Counsel]: And why were you incarcerated, specifically? . . .

"[The Respondent]: Possession of narcotics."

In addressing the criteria required by § 17a-112 (k) the court found that the respondent is unable or unwilling to

---

[7] The record does not contain a description of the parenting classes or any evidence that the respondent completed them.

benefit from reasonable reunification efforts, his serious issues clearly and convincingly make him unable or unwilling to benefit from reasonable reunification efforts, he failed to comply with the steps ordered by the court and he has not been able to take full advantage of services, as he has been incarcerated for most of the current department involvement.

As we noted earlier, termination of parental rights may not be grounded on a respondent's incarceration alone. On the basis of our review of the court's complete memorandum of decision and the record, we conclude that the court's findings with respect to the respondent's failure to achieve sufficient rehabilitation are not based on incarceration alone. Perhaps the court did not express itself artfully, but the essence of its finding is that the respondent's incarceration prevented him from complying with the court-ordered steps that he signed. Failure to achieve sufficient rehabilitation was not at issue in *In re Juvenile Appeal (Docket No. 10155)*, supra, 187 Conn. 443 (termination of parental rights on ground of abandonment). That case, however, articulated the principle that controls the circumstances in this case.

Our Supreme Court stated: "The trial court was careful to indicate that in its view imprisonment alone does not constitute *abandonment*, and in this it was correct. See *Matter of Adoption of Cottrill*, 388 So. 2d 302, 305 (Fla. App. 1980) [imprisonment]; *Matter of Adoption of Herman*, 406 N.E.2d 277, 279 (Ind. App. 1980) [imprisonment]; *Staat* v. *Hennepin County Welfare Board*, 178 N.W.2d 709, 712–13 (Minn. 1970) [imprisonment; termination of parental rights]; *In re Sego*, 82 Wash. 2d 736, 740, 513 P.2d 831 (1973) [imprisonment; termination of parental rights]. On the other hand, *the inevitable restraints imposed by incarceration do not in themselves excuse a failure to make use of available though limited resources* for contact with a distant child."

(Emphasis added.) *In re Juvenile Appeal (Docket No. 10155)*, supra, 187 Conn. 443.

The rule of law on which the respondent has based his claim initially was applied to termination of parental rights on the ground of abandonment,[8] but since then it has been applied to other grounds for termination of parental rights. See, e.g., *In re Hector L.*, 53 Conn. App. 359, 730 A.2d 106 (1999) (failure to achieve sufficient rehabilitation). Here, the termination of parental rights petition alleged the respondent's failure to achieve a sufficient degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the respondent could assume a responsible position in the life of the child. See General Statutes § 17a-112 (j) (3) (B) (i).

The "inevitable restraints" imposed by incarceration are directly applicable to the facts of this case, in which the respondent was ordered to take advantage of services for substance abuse, drug testing and improved parenting skills. In addition, the respondent's failure to keep department personnel apprised of his whereabouts and his failure to communicate through relatives, counselors or the telephone until 2009, supports the court's finding that the respondent was unwilling or unable to benefit from reunification services. Steps were ordered for the respondent in August, 2006. It was not until almost three years later in June, 2009, that the

---

[8] "Abandonment is established by clear and convincing evidence that a parent has failed to maintain a reasonable degree of interest in or concern or responsibility for the welfare of the child. General Statutes § 17a-112 (j) (3) (A). The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Internal quotation marks omitted.) *In re S.D.*, 115 Conn. App. 111, 122, 972 A.2d 258 (2009).

respondent engaged in parenting classes and considered entering drug treatment in the federal prison. June, 2009, was three months prior to the trial on the termination of parental rights petition. The respondent failed to make use of the resources available to him in prison until the eleventh hour. "Although the respondent could not avail himself of the rehabilitative programs available through the department because of his incarceration, it does not excuse his failure to use the resources offered by the department of correction. See *In re Roshawn R.*, [51 Conn. App. 44, 53, 720 A.2d 1112 (1998)]." *In re Hector L.*, supra, 53 Conn. App. 367–68.

In his brief, the respondent relies on *In re Tailena R.*, Superior Court, judicial district of Tolland, Docket No. CP-07-012814-A (December 17, 2009), for the proposition that incarceration alone is not sufficient to terminate parental rights. The facts of that case, however, actually support the court's finding here. The court in *In re Tailena R.* stated: "[C]hild protection cases in Connecticut tend to view the whole parent-child relationship, pre- and postincarceration. Incarcerated parents have the ability to participate in the child protection proceedings. Counsel are appointed for them; usually visitation is available to the incarcerated parent in prison, and they are transported to the proceedings to fully participate. That has not been true in this case since the respondent is in California." Id.

In *In re Tailena R.*, the court, *Foley, J.*, found that department personnel had been unable to offer services to that respondent, who was incarcerated in California, and that they were unable to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, due to that respondent's incarceration and the geographic distance between Connecticut and California. The *In re Tailena R.* respondent was to engage in services and did not do so, or did not report his efforts to the department, and due to his

confinement was unable to maintain regular and consistent contact with his children. Judge Foley, therefore, found that the respondent had not achieved sufficient rehabilitation within the meaning of § 17a-112 (j) (3) (B) (i). Here, the evidence indicates that while the respondent was in prison in Connecticut, the departmental personnel facilitated visitation between the respondent and the child. When the respondent was moved out of state, department assisted visitation ended in part because the respondent's social worker could not communicate with him, did not know where he was and he was, at one point, hundreds of miles from Connecticut in Cumberland, Maryland.

For all of the foregoing reasons, we conclude that the court's finding that the respondent had failed to achieve sufficient rehabilitation within the meaning of § 17a-112 (j) (3) (B) (i) was not clearly erroneous and that the court's finding is not predicated on the respondent's incarceration alone.

II

The respondent's second claim is that the court's finding that the department made reasonable efforts to reunify the family was clearly erroneous. We disagree.

The respondent takes particular issue with the following sentence in the court's memorandum of decision: "Considered carefully, the clear and convincing evidence shows that [the department] offered timely, appropriate and comprehensive services to the respondent parents to facilitate [their] reunification with [their] child and made reasonable efforts to reunite [them] with [their] child." The respondent criticizes the court for not distinguishing the services offered to the mother and to him, and then argues that department personnel did not offer him any services. Although we agree that the court's memorandum of decision would have been clearer if it had listed the services offered

to each of the parents, the record does not support the respondent's contention that department personnel offered him no services.

Significantly, the respondent has overlooked the language that immediately follows the court's statement, to which he takes no exception. The court stated: "Based on this clear and convincing evidence of the circumstances now present in this case, the court finds that [the respondent] is unable and, or, unwilling to benefit from reasonable reunification efforts. General Statutes § 17a-112 (j) (1). His serious issues clearly and convincingly make him unable and, or, unwilling to benefit from reasonable reunification efforts. . . . The parents have been provided with many services to rehabilitate and return the child to their care, and the referrals were made in a timely manner to facilitate a successful reunification. They were referred to services multiple times to encourage cooperation. [The respondent] has not been able to take full advantage of services, as he has been incarcerated for most of the current [department] involvement." (Citation omitted.)

Section 17a-112 (k) (2) requires the court to determine whether the department "has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended . . . ." "The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Tabitha T.*, 51 Conn. App. 595, 600, 722 A.2d 1232 (1999).

The record in this case demonstrates that while the respondent was incarcerated in Hartford, department personnel facilitated visits between him and the child.

Following the respondent's transfer to a correctional facility in Rhode Island, Silas communicated with his family monthly and asked his family to have him contact the social worker. The department investigated members of the respondent's family as a possible resource for the child but found that they did not qualify for licensure. Silas testified that she attempted to telephone the respondent at the Rhode Island correctional institution but the respondent had failed to list the department on his contact sheet. In addition, the petitioner entered into evidence photocopies of letters mailed to the respondent at various correctional institutions where he was incarcerated. On the basis of this record, we conclude that the court's finding that the department made reasonable efforts to reunite the family was not clearly erroneous. Accord *In re Jermaine S.*, 86 Conn. App. 819, 838–39, 863 A.2d 720, cert. denied, 273 Conn. 938, 875 A.2d 43 (2005).

### III

The respondent's third claim is that the court's finding that he had failed to achieve sufficient personal rehabilitation within the meaning of § 17a-112 (j) (3) (B) (i) was clearly erroneous. We do not agree.

"Personal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and useful role as a parent [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation

she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Internal quotation marks omitted.) *In re Trevon G.*, 109 Conn. App. 782, 789, 952 A.2d 1280 (2008). "[T]he critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." *In re Danuael D.*, 51 Conn. App. 829, 840, 724 A.2d 546 (1999). The personal rehabilitation inquiry requires the court to obtain a historical perspective of the respondent's child caring and parenting abilities. See *In re Galen F.*, 54 Conn. App. 590, 594, 737 A.2d 499 (1999).

The substance of the respondent's claim is that the court's finding that his failure to achieve sufficient rehabilitation was based on the fact that the department failed to provide him with services or to initiate communication with him because he was incarcerated. This appears to be another way of arguing that the court terminated the respondent's parental rights on the basis of his incarceration alone. As discussed in part I of this opinion, incarceration alone may not be considered a basis for the termination of parental rights. Nonetheless, incarceration imposes limitations on what the department and its social workers can do and what services it can provide for an incarcerated parent facing termination of his or her parental rights. Finally, the respondent ignores the fact he failed to abide by the court-ordered step, which he signed, to keep the department aware of his whereabouts.

The respondent also argues that even though the department did not provide him with services, he obtained services on his own. The only evidence in the record that the respondent attempted to address his substance abuse and parenting limitations is his testimony that he attended programs in the federal prison

during the summer of 2009, three years after the court-ordered steps and three months before trial. The respondent's efforts came too late to demonstrate personal rehabilitation sufficient to assume a responsible position in the life of the child. On the basis of the record before us, we conclude that the court's finding that the respondent was not able to take full advantage of the services offered to him given his incarceration is not clearly erroneous. Moreover, at trial, the respondent himself conceded that he was not in a position to be a parent to the child because he was incarcerated for possession of narcotics.

At the time of trial, the child was three years and eight months old, and the respondent was not expected to be released to a halfway house in Hartford until April, 2010, when the child would be four years old. At that time, the respondent would not have housing suitable for the child, and he would not have demonstrated an ability to hold legal employment or avoid further contact with the criminal justice system. Moreover, the respondent would not have seen the child since she was an infant. The court found that the respondent's substance abuse and lack of parenting skills were serious issues. The court therefore found that the respondent and the child would need significant visitation and that he would have to attend parenting classes to establish a parental bond. Also, although the respondent claimed to have participated in an inpatient substance abuse program, there was no evidence that he would be able to maintain sobriety when he was released from incarceration.

The court also found that the child had resided for almost two years with a preadoptive foster family where she was bonded to the other children living there and to her foster parents. She attended a preschool and was doing well. Given the child's tender age and her need for stability and permanency, we conclude that there

was clear and convincing evidence in the record that the respondent had not achieved the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the child, he could assume a responsible position in the child's life. We find that the record supports the court's findings and that they are not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.