# IN RE DYLAN C.*
## (AC 32309)

Harper, Lavine and Flynn, Js.

Argued November 9, 2010—officially released January 11, 2011

---

\* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Elizabeth M. H.*, pro se, the appellant (respondent mother).

*Colleen B. Valentine,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Michael Besso,* assistant attorney general, for the appellee (petitioner).

*Robert W. Lewonka,* for the minor child.

*Opinion*

LAVINE, J. The respondent mother, appearing pro se, appeals from the judgment of the trial court terminating her parental rights as to her minor child, D, for failure to achieve sufficient personal rehabilitation within the meaning of General Statutes § 17a-112 (j) (3).[1] On appeal, the respondent claims that (1) there was insufficient evidence from which the court could find by the clear and convincing standard of proof that she had failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of D, she could assume a responsible position in his life and (2) she received ineffective assistance of counsel.[2] We affirm the judgment of the trial court.

The record discloses the following procedural history. D was born prematurely on August 4, 2007, and the petitioner, the commissioner of children and families, filed a motion for an order of temporary custody and a neglect petition with respect to him on August 27, 2007. D was committed to the petitioner's custody

[1] The parental rights of D's father also were terminated pursuant to § 17a-112 (j) (3). The father is not a party to this appeal. In this opinion, we refer to the respondent mother as the respondent.

[2] On appeal to this court, counsel for the child has adopted the position of the petitioner, the commissioner of children and families.

on February 5, 2008. On April 7, 2009, the petitioner filed a petition to terminate the respondent's parental rights as to D on the ground that she had failed to achieve sufficient personal rehabilitation. See General Statutes § 17a-112 (j) (3) (B) (i).[3] The petitioner filed two successive motions to review the permanency plan for D, both times proposing termination of the respondent's parental rights. The respondent objected to the plans. The permanency plan and the petition to terminate the respondent's parental rights were consolidated for trial, which was held on March 8 and April 16, 2010. The court, *Olear, J.*, issued its memorandum of decision on April 23, 2010.

Pursuant to the evidence presented at trial, the court made the following findings of fact in its memorandum of decision. The respondent, who was born in Vermont, was then thirty-seven years old. As a young child, she and her family moved frequently among the states before settling in Connecticut when the respondent was in the seventh grade. According to the respondent, her father was an alcoholic. She often heard her parents argue but never witnessed any physical violence between them. Her father left her mother (maternal grandmother), who had to raise their children alone.

The respondent left high school when she was in the eleventh grade but subsequently earned her graduate equivalency degree in 1992. She has been employed by various concerns since she was fifteen years old, and

---

[3] General Statutes § 17-112 (j) provides in relevant part: "The Superior court . . . may grant a petition . . . if it finds by clear and convincing evidence that . . . (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

her last reported employment has continued for approximately ten years. She has no reported criminal history.

The respondent is the mother of five children, including D. On May 3, 2007, neglect petitions were filed with regard to her four oldest children, J, C, V and CC. All of them and D were adjudicated neglected on February 5, 2008. Domestic violence has been a factor in all of their lives.[4]

The respondent bore two children by D's father, CC, born in July, 2006, and D. Although CC was adjudicated neglected, he remained with the respondent under an order of protective supervision, which was extended three times. The last such order was scheduled to end on October 7, 2009, but on June 9, 2009, the department of children and families (department) invoked a ninety-six hour administrative hold on CC. See General Statutes § 17a-101g. On June 21, 2009, an ex parte order of temporary custody was granted as to CC, and on November 3, 2009, the court, *Harleston, J.*, found that it was in CC's best interest to be committed to the custody of the petitioner.

At trial, the respondent reported that she has no intention of renewing a relationship with D's father, whom

---

[4] When the respondent was evicted from housing on August 20, 2007, she placed her oldest child, J, with the maternal grandmother. In January, 2008, J was committed to the custody of the petitioner. The court found that the respondent blamed the maternal grandmother for J's commitment, rather than taking responsibility for her own acts and omissions. J became eighteen years old in October, 2009. The respondent reported to Stephen M. Humphrey, a court-appointed clinical psychologist, that J's father, Lionel P., was mean and abusive. She stated: "It wasn't so much the physical as the mental. He was mentally abusive. I would rather be beaten on than emotionally abused on a daily basis."

The respondent's children, C, born in 1998, and V, born in 2004, were fathered by Michael D., whom the respondent married in 2001 and divorced in 2004. After C and V were adjudicated neglected, they were committed to the custody of the petitioner, but the commitment was revoked on September 24, 2009, when their guardianship was transferred to a paternal aunt and uncle.

she never married. The two have a torturous history of domestic violence. Protective orders were issued in favor of the respondent against the father on May 31, 2007, April 22, 2008, and June 10, 2009. A standing criminal restraining order was issued in favor of the respondent against the father on October 23, 2009.

Judge Olear found that one of the children reported that the father slaps the respondent, pulls her hair and threatens to "take her last breath." On March 10, 2007, a hotline report of domestic violence was received. The father reportedly was angry about money and the condition of the couple's apartment. The respondent locked herself in the bathroom and would not open the door. The father attacked the bathroom door with a hammer. CC was in a car seat approximately twelve feet from the shattering door. The father was arrested as a result of this incident. On April 22, 2008, the father was arrested for disorderly conduct after he forced open a locked bathroom door to gain access to the respondent and pushed her into a window.

Another incident of domestic violence occurred on June 9, 2009, precipitating the ninety-six hour hold on CC. On that date, police responded to a call from the maternal grandmother, who reported that the father was assaulting the respondent. The father had sent a text message to the respondent, calling her a derogatory and insulting name and indicating that he had something for her when she got home. When he was at home with the respondent, he grabbed her long hair, wrapped it around his fist and punched her head repeatedly. CC was present, reportedly crying and saying something to the effect of "don't hit mommy." The father was arrested, charged and incarcerated as a result of the incident.

With regard to D, the court found that the respondent did not receive appropriate prenatal care when she was

pregnant with him. He has never been in the care of either of his parents, as an order of temporary custody was granted before he was released from the hospital,[5] and he was placed in a foster home. D moved from his initial foster home on June 19, 2009, to a legal risk preadoptive home because the initial foster family was not an adoptive resource. D was familiar with his new foster family because they earlier had provided respite care for him.

Prior to the filing of the petition to terminate the respondent's parental rights, D was evaluated by the Birth to Three program and was found not to be in need of services. In the fall of 2009, he again was evaluated by the Birth to Three program because his speech and motor skills were delayed. He began receiving services from the Birth to Three program in October, 2009. In addition to his developmental delays, D suffers from asthma. At the time of trial, he was attending preschool and visiting with the respondent and her other children.

At the time D was adjudicated neglected, specific steps were ordered for the respondent. The court found that the respondent generally complied with the step to keep all appointments set by or with department personnel and to cooperate with department home visits and visits with D's court-appointed counsel and guardian ad litem. The respondent also was to participate in counseling and to make progress toward identified goals. The respondent's goals generally were related to parenting and family and individual counseling. Her specific goals were to learn how parental choices can negatively impact children and how domestic violence affects children and their need to feel safe.

---

[5] Due to his premature birth, D remained in the hospital until he was taken into custody by personnel from the department, who were alerted by hospital personnel that he may have been abandoned.

The court also found, with regard to the ordered steps, that the respondent cooperated with court-ordered evaluations with Stephen M. Humphrey, a court-appointed psychologist, and with restraining and protective orders to avoid further incidents of domestic violence. She had no further involvement with the criminal justice system, and she visited with D consistently pursuant to department directives. The respondent has been employed since D was born.

The respondent did not do as well, however, with the step requiring that she secure and maintain housing and report any changes in the composition of her household to department personnel. The court found that the respondent had been evicted five times between 2006 and 2008. When D was born, the respondent and the father were homeless and living in a motel. The respondent continued to live a transient lifestyle until July, 2008, when she and CC went to live at the Friendship Center shelter (shelter) where they resided until May, 2009. While residing at the shelter, the respondent was at risk of being evicted for failing to pay shelter fees and utility bill arrearages and to save money to rent an apartment. The respondent was giving money to the father, rather than using her funds for her own obligations. On April 17, 2009, department personnel learned that the respondent was refusing to provide the shelter with promised funds. After department personnel and police met with the respondent, she agreed to honor her obligations. In May, 2009, the respondent moved from the shelter to an apartment, but the father's name was on the lease despite the respondent's having been advised that she was not to let CC have contact with him outside of department supervised visits.

On August 16, 2009, police responded to the respondent's apartment after receiving a report of domestic violence involving her roommate. The roommate reported that her boyfriend, the father of her three

children, whom she permitted to stay in the apartment to care for their children, was yelling at her and punching her bedroom door in the children's presence. The respondent was present during the incident but did not call the police. The roommate's boyfriend is the brother of D's father. Shortly before August, 2009, the roommate's boyfriend had been released from prison in Florida where he had been incarcerated due to domestic violence incidents involving the respondent's roommate.

As a result of the police response to the incident, department personnel learned for the first time that the respondent had a roommate. Moreover, department personnel were concerned about the respondent's living in an apartment that was frequented by the brother of D's father. As trial ended, the respondent was still living in the apartment with the same roommate, but she recently had signed a lease for supportive housing where she could live with CC.

Pursuant to § 17a-112 (j) (1), the court found that department personnel had made reasonable efforts to reunify D with the respondent. The respondent had been referred to numerous appropriate service providers, including, among others, the YWCA for parenting classes and Catholic Charities for counseling.[6] Department personnel also provided case management services, financial assistance and referrals to help the respondent find supportive housing.

---

[6] In September, 2007, the respondent was referred to the Wheeler Family Center for supervised, therapeutic visits that incorporated parenting education. The respondent attended fifteen of twenty-seven sessions between September, 2007, and March 6, 2008. At the end of the program, the respondent was advised to continue supervised visits and counseling for domestic violence. In November, 2007, the respondent was referred to the VOCA domestic violence program offered through New Britain General Hospital. She refused to participate, however, because she did not believe that she needed such services.

The respondent also was referred to Prudence Crandall Center for a domestic violence program on several occasions, but for some time, she elected not to participate. At trial, the respondent testified that she did not

Ultimately, the court found, by clear and convincing evidence, that the respondent had failed to achieve such degree of rehabilitation so as to encourage the belief that, within a reasonable period of time, she could assume a role as a responsible parent to D. At the time D was adjudicated neglected, the respondent had issues arising from her experiences with domestic violence, lack of understanding of domestic violence or its effect on her children, inadequate parenting skills and inability to provide a safe, stable and nurturing home for D. At trial, the respondent's counsel pointed to evidence that the respondent had complied with many of the specific steps she was ordered to follow, and, therefore, she had achieved sufficient rehabilitation so as to be a responsible parent to D. The court disagreed with counsel, stating in its memorandum of decision that "even assuming that [the respondent] did comply with the steps, the court finds that such compliance, in and of itself, does not indicate that [the respondent] has sufficiently rehabilitated herself to allow the court to find that she could parent [D] within a reasonable and foreseeable time. A parent's compliance with court-ordered

attend the program because she had no child care for CC and that he was too young to attend the program with her. She also testified, however, that she was advised that day care was available at Prudence Crandall Center. The court found that the respondent did not take responsibility for failing to attend the program but blamed her lack of child care, which, in fact, was available. The respondent ultimately completed a six week classroom program at Prudence Crandall Center in August, 2009. Prudence Crandall Center personnel recommended that the respondent receive individual counseling.

In August, 2008, the respondent was referred to and engaged with Catholic Family Services for individual therapy. The respondent continued receiving individual therapy at the time of trial. In a December 14, 2009, letter from Catholic Charities, a clinician, Ki-Young Burby, noted that the respondent "appears to have an insight" with respect to "domestic violence experiences and trauma." At trial, however, Burby testified that between October, 2009, and February, 2010, the respondent attended only four out of ten scheduled therapy sessions. In Burby's opinion, although the respondent was making progress, she had not yet met her therapeutic goals.

expectations or specific steps entered at the time of the neglect adjudication is relevant, but not dispositive to the rehabilitation finding. See *In re Luis C.*, 210 Conn. 157, 554 A.2d 722 (1989); *In re Trevon G.*, 109 Conn. App. 782, 952 A.2d 1280 (2008)."

In analyzing the evidence before it, the court further stated that although the respondent had taken steps to address her transience, she had not done so seamlessly. She was on the verge of being evicted from the shelter due to her inability to extricate herself from the father. It was only after the petition to terminate her parental rights was filed and department personnel and police intervened that the respondent agreed to honor her financial obligations to the shelter, rather than give her money to the father. Moreover, the father was seen at the shelter even though the respondent knew that he was not to have unsupervised contact with CC, who was in her care. The respondent moved into an apartment in May, 2009, after the termination petition was filed, but the father's name was on the lease. There was an incident of domestic violence between the respondent's roommate and the roommate's boyfriend in August, 2009.

The respondent was referred to various services to help her gain an understanding of the impact of domestic violence. The respondent initially declined to participate in such services, as she did not believe that she needed them, although the domestic violence in her relationship continued. Department personnel were concerned that there were incidents of domestic violence between the respondent and the father that were unreported. The concern was raised by the respondent's having a black eye. The respondent continued her relationship with the father, despite continued abuse, until he was arrested in June, 2009. She represented to department personnel that she and the father would remain an intact family and raise their children.

Following the June, 2009 domestic violence incident, the respondent verbalized that she had gained insight into the destructive effect of domestic violence, but she continued to live with a roommate who was enduring domestic violence at the hands of her boyfriend, who was the brother of D's father. The respondent continued her behavior despite having been instructed to avoid involvement with persons having a history of abusive behavior or a criminal record and to end promptly any acquaintance when she became aware that such factors existed.

The court further reasoned that although the respondent had made some progress, she was on a journey of self-discovery and needed to continue therapy to address her past trauma. The court was concerned that the respondent had attended only four of ten therapy sessions between October, 2009, and February, 2010, at Catholic Charities. Although the respondent had made progress, she had not met her treatment goals by demonstrating that she had insight as to the impact domestic violence has on her and her children or that she is able to care for her children safely. The court quoted from Humphrey's psychological evaluation of October 13, 2009, which stated in part: "[The respondent's] lengthy history of involvement [with the father] (and other abusive men) despite the offer of services, engagement in services, and significant consequences, argues against her caring for children presently." The court found that the respondent's " 'present inability' " that existed in September, 2009, continued to the time of trial with respect to D.

The court observed that, under § 17-112 (j), personal rehabilitation has a context that must take into consideration the age and needs of the child. The linchpin to a determination that rehabilitation has occurred necessarily includes a finding that the parent can begin or resume parenting within a reasonable period of time.

The question is not simply one of rehabilitation; it is whether the respondent can meet the particular needs of the child within a reasonable time. See *In re Amneris P.*, 66 Conn. App. 377, 384–85, 784 A.2d 457 (2001). Humphrey questioned the benefit the respondent has received from the interventions made on her behalf, as she has not demonstrated that she knows how to keep her home free from violent behavior. She has not learned to distance herself from persons who have a history of violence so she can protect herself and any children in her care.

The court noted that "[p]sychological testimony from professionals is appropriately accorded great weight in termination proceedings," quoting *In re Shyliesh H.*, 56 Conn. App. 167, 176, 743 A.2d 165 (1999). The court found that Humphrey had noted that the respondent has a family system that is "vulnerable to rapid deterioration" and that it would not be in D's best interest to be introduced to such a family system after his not having been in the respondent's care. The court found that D had been in the custody of the petitioner since he was a few weeks old and that, at the time of trial, he was more than two and one-half years old. He has some special needs due to his speech and motor skill delays and needs a parent who reliably can attend to his needs and provide him with a safe, stable home that is violence free.

The court examined the respondent's history with her four other children to gain perspective on the respondent's child caring and parenting abilities to determine if she had achieved rehabilitation.[7] See *In re Galen F.*, 54 Conn. App. 590, 594, 737 A.2d 499 (1999). It noted that Humphrey did not recommend that the

---

[7] At the time of trial, none of the respondent's children was in her care. All of her children, except CC, had been out of her care for more than two years.

respondent be reunified with D. Humphrey, however, contemplated the possibility of the respondent's being reunited with CC. That possibility, however, was predicated on the respondent's continued progress in therapy and compliance with recommendations. Humphrey did not recommend extended visits between the respondent and CC until at least March, 2010, and he did not recommend that reunification occur any sooner than September, 2010. The court extrapolated the time frame established for CC and applied it to D. The court inferred that the respondent and D needed a bare minimum of six months to one year of expanded visits before reunification could be considered. By that time, D would be older than three years of age, but, the court noted, there was no guarantee that reunification could begin at that time. The court was unwilling to put D's "permanency [on] the shelf" for such an extended period of time.

The court considered its findings, D's age, the time he had spent in the petitioner's custody and his need to be raised in a home that is violence free and concluded that the respondent had failed to achieve rehabilitation to a degree sufficient to allow for reasonable assurance that D could be returned to her care within any foreseeable period of time. The court found that the petitioner had proven by clear and convincing evidence that the respondent's parental rights should be terminated pursuant to § 17a-112 (j) (3) (B) (i).

The court then turned to the dispositional phase of the proceedings and made the seven findings required by statute. See General Statutes § 17a-112 (k). At the time of trial, D was two years and eight months old. Department personnel had made reasonable efforts to allow the respondent to achieve rehabilitation, but she was unable to benefit from the services offered. Although the respondent complied with many of the

court-ordered steps, she did not make sufficient progress in a timely manner to permit reunification with D in a reasonable period of time.

The court found that the respondent had visited with D and that she has love and affection for him, but that is not the test for the best interest of the child. During Humphrey's interactional evaluation, D did not demonstrate a bond with the respondent, and the respondent introduced insufficient evidence to permit a contrary finding. D had lived with his current foster family, which previously provided respite care for the initial foster placement, for approximately ten months. The court found that D is attached to his current foster family and refers to those foster parents as "mommy" and "daddy." He looks to them for comfort, and they have provided him with a stable and nourishing environment.

The court also found that the respondent had made belated efforts to adjust her conduct by obtaining appropriate housing and continuing counseling. She consistently had visited with D and maintained contact with department personnel. The respondent's efforts, however, fell short. For too long a time, she put her relationship with the father ahead of her relationship with D. She blamed others for her failure to have D in her care. The court found that the respondent had failed to adjust her circumstances, conduct and behavior in a reasonable period of time so as to make it in the best interest of D to be reunified with her in the foreseeable future. The court concluded that to give the respondent a reasonable period of additional time would not likely bring her performance as a parent to an acceptable level. The court found that no unreasonable conduct by the child protection agency, foster parents or third parties, nor the economic circumstances of the respondent, prevented her from having a meaningful relationship with D.

The court also considered the totality of circumstances surrounding D, including his interest in sustained growth, development, well-being, stability, continuity of environment, length of stay in foster care, the nature of his relationship with his foster and biological parents and the degree of contact he has had with the respondent. See *In re Alexander C.*, 60 Conn. App. 555, 559, 760 A.2d 532 (2000). The court balanced D's intrinsic need for stability and permanency against the benefits of maintaining a connection with the respondent. See *Pamela B.* v. *Ment*, 244 Conn. 296, 313–14, 709 A.2d 1089 (1998).

The court compared the paths of D and CC. CC remained in the respondent's care from the time of his birth until June, 2009. He is bonded with the respondent, but he exhibits behavioral difficulties during his visits with her. He has screamed at her and told her that he will have "daddy" kill her. For a time, CC was placed in foster care with D but had to be removed because he attacked D and tried to choke him. Humphrey did not recommend that CC and D reside together. The court observed that the respondent and CC have much work to do if the proposed reunification is to occur and be successful.

As noted, D is bonded with his current foster family. He looks to them for comfort and is a child who needs permanency. The court concluded that due to the length of time that D has been in the petitioner's custody, due to the respondent's failure to achieve sufficient rehabilitation, it would not be in D's best interest to be reunified with her. The court also considered that D's counsel advocated for the termination of the respondent's parental rights. The court, therefore, found by clear and convincing evidence that termination of the respondent's parental rights as to D were in his best interest.[8]

---

[8] With respect to the petitioner's proposed permanency plan; see General Statutes § 46b-129 (k) (1); the court considered the evidence and found

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *In re Katia M.*, 124 Conn. App. 650, 660, 6 A.3d 86 (2010).

"The legal framework for deciding termination petitions is well established. [A] hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 . . . exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the

by a preponderance of the evidence that the plan for termination of the respondent's parental rights is in D's best interest. The court approved the plan and overruled the respondent's objection thereto.

child. . . . The best interest determination also must be supported by clear and convincing evidence." (Citations omitted; internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 487–88, 940 A.2d 733 (2008).

## I

The respondent's first claim is that there was insufficient evidence from which the court could have found by the clear and convincing standard of proof that her parental rights as to D should be terminated and that it was in D's best interest to do so. We disagree.

"An appeal based on the sufficiency of evidence to support a factual finding carries a legal and practical restriction to review. The function of an appellate court is to review, and not to retry, the proceedings of the trial court. . . . Further, we are authorized to reverse or modify the decision of the trial court only if we determine that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that its decision is otherwise erroneous in law." (Internal quotation marks omitted.) *Anderson* v. *Whitten*, 100 Conn. App. 730, 739, 918 A.2d 1056 (2007).

"The clear and convincing standard of proof is substantially greater than the usual civil standard of a preponderance of the evidence, but less than the highest legal standard of proof beyond a reasonable doubt. It is sustained if the evidence induces in the mind of the trier a reasonable belief that the facts asserted are *highly probably* true, that the probability that they are true or exist is *substantially greater* than the probability that they are false or do not exist. . . .

"Although we have characterized this standard of proof as a middle tier standard . . . and as an intermediate standard . . . between the ordinary civil standard of a preponderance of the evidence, or more probably than not, and the criminal standard of proof

beyond a reasonable doubt, this characterization does not mean that the clear and convincing standard is necessarily to be understood as lying equidistant between the two. Its emphasis on the *high probability* and the *substantial greatness of the probability* of the truth of the facts asserted indicates that it is a very demanding standard and should be understood as such . . . . We have stated that the clear and convincing standard should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." (Citations omitted; emphasis in original; internal quotation marks omitted.) *In re Giovanni C.*, 120 Conn. App. 277, 279–80, 991 A.2d 638 (2010).

"Personal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and useful role as a parent [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Internal quotation marks omitted.) *In re Trevon G.*, supra, 109 Conn. App. 789.

We have reviewed the record and evidence before the court and the court's thorough and thoughtful memorandum of decision. We conclude that the court's finding that the respondent has failed to achieve sufficient

rehabilitation is supported by clear and convincing evidence. The link to determining that the respondent has achieved sufficient rehabilitation is whether she can be a parent to D in the foreseeable future, given his age and needs. The overwhelming evidence as previously set forth is not contrary or equivocal. Department personnel and service providers indicated that the respondent had unresolved domestic violence issues. Police were called to the respondent's residence six months prior to trial to respond to domestic violence, albeit not directly involving the respondent. The living arrangement was not one in which the respondent could protect her children from witnessing domestic violence. The court properly relied on the psychological report prepared by Humphrey, who did not foresee the respondent's being able to parent D in a reasonably foreseeable time, if ever.

At the conclusion of trial, D was two years and eight months old, a child with developmental delays and special needs. It was the court's job to determine whether the respondent had achieved such degree of personal rehabilitation that she could be a parent to him, especially if CC, who is just one year older than D, was also in her care. Compare *In re Chevol G.*, 125 Conn. App. 618, 622, 9 A.3d 413 (2011) (mother lacked skills, stability, consistency to be responsible for children); *In re Tremaine C.*, 117 Conn. App. 590, 600, 980 A.2d 330 (trial court expressed concern whether mother could care for newborn and child two and one-half years old), cert. denied, 294 Conn. 920, 984 A.2d 69 (2009). We found no evidence in the record that the respondent could be a responsible parent to D within a reasonable time, given his need for permanency.

We agree with the court that the respondent has made some progress with regard to understanding domestic violence, how it has affected her and the impact it has on her children. Compare *In re Jocquyce C.*, 124 Conn.

App. 619, 626, 5 A.3d 575 (2010) ("respondent failed to acknowledge her habitual involvement in domestic violence and the impact that it has on her family"). We commend that progress. Her efforts, however, have come too late to make the type of progress required under § 17a-112 (j) (3) (B) (i). It is an unfortunate reality that sometimes parents fail to take the steps necessary to achieve personal rehabilitation until the petitioner has filed a petition to terminate parental rights and there is little time to do the needed work. See, e.g., *In re Katia M.*, supra, 124 Conn. App. 665–66 (father attended programs three years after court ordered steps, three months before trial).

Although the respondent has made strides in her rehabilitation, "[i]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) *In re Jocquyce C.*, supra, 124 Conn. App. 627. On the basis of our review of the record, we conclude that the evidence supports the court's finding, by the clear and convincing standard of proof, that the respondent has failed to achieve a sufficient degree of personal rehabilitation as required by the statute.

## II

The respondent's second claim is that she received ineffective assistance of counsel. Ordinarily, we would not review the respondent's claim because it was not raised at trial, and, therefore, the record is inadequate to review the claim. Moreover, the claim is merely the statement of a legal conclusion and is not adequately briefed. The evidence on the face of the record, however, demonstrates that the respondent was not prejudiced by the representation she received at the

termination of parental rights trial. The respondent's claim, therefore, fails.

"In Connecticut, a parent who faces the termination of his or her parental rights is entitled, *by statute*, to the assistance of counsel. . . . Because of the substantial interests involved, a parent in a termination of parental rights hearing has the right not only to counsel but to the effective assistance of counsel." (Citation omitted; emphasis added; internal quotation marks omitted.) *In re Alexander V.*, 223 Conn. 557, 569, 613 A.2d 780 (1992).[9]

"In determining whether counsel has been ineffective in a termination proceeding, we have enunciated the following standard: The range of competence . . . requires not errorless counsel, and not counsel judged ineffective by hindsight, but counsel whose performance is reasonably competent, or within the range of competence displayed by lawyers with ordinary training and skill in [that particular area of the] law. . . . The respondent must prove that [counsel's performance] fell below this standard of competency and also that the lack of competency contributed to the termination of parental rights. . . . A showing of incompetency without a showing of resulting prejudice . . . does not amount to ineffective assistance of counsel." (Citations omitted; internal quotation marks omitted.) *In re Matthew S.*, 60 Conn. App. 127, 131–32, 758 A.2d 459 (2000).

In this case, we need not decide whether the respondent's counsel provided assistance that fell below that

[9] We know of no procedural mechanism within a termination of parental rights proceeding that provides for the creation of a record to determine the effectiveness of counsel. In the absence of a fully developed record, claims of ineffective assistance in such proceedings are likely to be unavailing. Moreover, we note that in *In re Jonathan M.*, 255 Conn. 208, 229, 764 A.2d 739 (2001), our Supreme Court determined that a petition for a writ of habeas corpus alleging ineffective assistance of counsel may not be used to attack collaterally a judgment terminating parental rights.

of lawyers with ordinary training in termination of parental rights cases because the respondent has not demonstrated that her counsel's representation resulted in prejudice to her.[10] The record reveals that any alleged deficiency did not result in prejudice. As set out in detail in part I of this opinion, the court found by clear and convincing evidence that the respondent had failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of D, she could assume a responsible position in his life. The evidence presented by the petitioner demonstrates that the respondent's acts and omissions, not those of her lawyer, were responsible for the termination of her parental rights.

Moreover, our Supreme Court has "indicated . . . that the trial judge is a minister of justice rather than strictly an umpire in a forensic encounter . . . . Although as a trial judge must adhere to dictates of impartiality, he or she, nevertheless, has the duty to deter and correct misconduct of attorneys with respect to their obligations as officers of the court to support the authority of the court and enable the trial to proceed

---

[10] In her brief, the respondent claims that her counsel was negligent for not presenting testimony from the maternal grandmother regarding familial structures, an expert domestic violence witness and entering into evidence e-mails and correspondence between her and the department and pictorial evidence of D's bonding with members of his family that she provided to her counsel. The respondent's brief, however, failed to explain how this claimed evidence was admissible, that it was not subject to attorney trial strategy analysis and how it would have altered the result of trial. See *In re Tremaine C.*, 117 Conn. App. 521, 523 n.2, 980 A.2d 317 (respondent could demonstrate no prejudice), cert. denied, 294 Conn. 920, 984 A.2d 69 (2009); *In re Mariah S.*, 61 Conn. App. 248, 269, 763 A.2d 71 (2000) (respondent failed to prove any alleged inadequacy of counsel could have affected outcome of termination proceedings), cert. denied, 255 Conn. 934, 767 A.2d 104 (2001). Having been presented only with the respondent's scant allegations of ineffective assistance, we have no basis, in fact or law, on which to conclude that she was prejudiced.

with dignity. . . . Thus, a judge presiding over a proceeding wherein trial counsel had been woefully inadequate would not, consistent with judicial duty sit idly by and permit the client to suffer the consequences. To be sure, the trial judge may be more inclined to vigilance in solemn proceedings, such as those terminating parental rights, wherein the indigent litigants have obtained court-appointed counsel." (Citations omitted; internal quotation marks omitted.) *In re Jonathan M.*, 255 Conn. 208, 234, 764 A.2d 739 (2001).

Here, the respondent has not identified where in the record, and we found nowhere in the record, that she alerted the court to her dissatisfaction with counsel[11] and asked the court to appoint new counsel. Nowhere in its memorandum of decision or in the transcript of the trial did the trial court give any indication that the respondent was not receiving effective assistance of counsel. The record discloses that the respondent's parental rights were terminated on the strength of the petitioner's case that she failed to achieve sufficient rehabilitation so as to be able to be a responsible parent to D within a reasonable time, given the needs of the child. For the foregoing reasons, the respondent's claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[11] The record is to the contrary. When the court canvassed the respondent before she testified, the court asked the respondent, among other things, "And are you satisfied with the help [your counsel] gave you?" The respondent answered: "[D]efinitely satisfied."