******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE WENDY G.-R.*
## (AC 46641)

Bright, C. J., and Suarez and Seeley, Js.

*Syllabus*

The respondent mother appealed to this court from the judgment of the trial court terminating her parental rights with respect to her minor child, W. W was born in Guatemala and immigrated to New Haven in 2018 with the respondent father. In 2019, following a sexual assault by a family member, W was adjudicated neglected and committed to the care of the petitioner, the Commissioner of Children and Families. From mid-2019 through December, 2021, the Department of Children and Families had limited and sporadic contact with the mother, who remained in Guatemala, and between December, 2021, and August, 2022, the mother did not respond to communications from the department. The mother immigrated to New Haven in July, 2022. The department was unaware of this until August, 2022, when the mother appeared, unannounced, at a supervised visit between W and the father. Thereafter, the department referred the mother to various services, with which she was reluctant to engage until early 2023. Trial on the termination of parental rights petition commenced in March, 2023. The petitioner initially alleged that, pursuant to statute (§ 17a-112 (j) (3) (D)), no ongoing parent-child relationship existed between the mother and W. At the conclusion of the evidentiary portion of the trial, the petitioner's counsel orally moved to amend the petition to add the adjudicatory ground of failure to rehabilitate as to the mother, pursuant to § 17a-112 (j) (3) (B) (i), "to conform to the proof elicited at trial." In the absence of any objection or request for a continuation, the trial court granted the motion and, thereafter, terminated the respondents' parental rights, determining, inter alia, that the petitioner proved that the mother had failed to rehabilitate but not that an ongoing parent-child relationship between the mother and W did not exist. *Held*:

1. The respondent mother could not prevail on her claim that she was denied her due process right to the effective assistance of counsel during the termination of parental rights proceeding: contrary to the mother's assertion, the fact that the petitioner sought to amend the petition at the close of evidence was not, in and of itself, a reasonable ground on which her counsel should have objected to the petitioner's motion, as the

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

applicable rule of practice (§ 34a-1 (d)) permitted an amendment at any time prior to a final adjudication; moreover, the mother could not satisfy her burden of demonstrating that her counsel's failure to object to the petitioner's motion to amend the petition could not be explained by one or more possible strategic reasons that were objectively reasonable, as the record was bereft of any evidence of the actual strategy the mother's counsel employed when she did not object to the petitioner's motion, and, instead of developing a record of her counsel's allegedly deficient performance or any resulting prejudice by filing a motion to open or a petition for a new trial, the mother merely claimed that the existing record amply demonstrated that her counsel acted deficiently and that her counsel's lack of competency contributed to the termination of her parental rights; furthermore, the only legally viable ground on which the mother's counsel could have objected to the petitioner's motion to amend the petition, namely, that the amendment amounted to unfair surprise and that she needed additional time to respond adequately to the failure to rehabilitate ground, was not objectively reasonable because the record reflected that, at trial, the petitioner presented evidence related to the failure to rehabilitate ground without objection, including a copy of the specific steps ordered to facilitate the mother's reunification with W, a permanency plan study that supported a finding that the mother had failed to satisfy her specific steps and, accordingly, had failed to rehabilitate, the testimony of a department social worker with respect to numerous issues that could interfere with the mother's ability to safely assume a responsible position in W's life, and the testimony of S, an expert in clinical and forensic psychology, that pertained to the mother's failure to rehabilitate; additionally, throughout the trial, the mother's counsel attempted to undermine such evidence through cross-examination and by presenting evidence of the mother's rehabilitative efforts, and the mother did not assert that her counsel should have presented any additional evidence or that additional time was necessary to prepare stronger arguments to refute the failure to rehabilitate ground; accordingly, this court was not persuaded that the failure of the mother's counsel to object to the petitioner's motion to amend was objectively unreasonable under the circumstances, and, even if the mother could satisfy her burden of demonstrating that such failure was objectively unreasonable, she failed to demonstrate that she was prejudiced by her counsel's incompetency.

2. The trial court properly determined that the respondent mother was unable or unwilling to benefit from efforts to reunify her with W, and, accordingly, it was unnecessary for this court to consider the merits of the mother's claim that the department failed to make reasonable efforts to reunify her with W: the mother did not challenge any of the trial court's specific subordinate findings as clearly erroneous and, instead, broadly challenged the court's assessment of the degree to which she was receptive to and utilized the services offered as well as its ultimate

determination that she was unable or unwilling to benefit from the department's services; moreover, in its findings, the trial court outlined the myriad efforts to reunify her with W that were made by the department despite the challenges posed by a global pandemic and the danger presented by the fact that the mother was residing in Guatemala until July, 2022, and those efforts were, on their face, not so lacking as to preclude a finding that the mother was unable or unwilling to benefit from such services; furthermore, the petitioner demonstrated by clear and convincing evidence that the mother had inconsistent communication with the department when she was in Guatemala, that she failed to timely notify the department of her whereabouts prior to July, 2022, that she was reluctant to engage in services offered by the department prior to 2023, which detrimentally delayed her ability to gain critical and necessary knowledge of how W's needs changed following her immigration to New Haven, and that, at the time of her evaluation by S, the mother still demonstrated a lack of insight into W's traumatic experiences resulting from her relocation to the United States, particularly her sexual abuse, and what was required for the mother to provide W with a safe, nurturing, and supportive environment free from insecurity.

Argued December 6, 2023—officially released May 2, 2024**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of New Haven, Juvenile Matters, and tried to the court, *Conway, J.*; judgment terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed.*

*Matthew C. Eagan*, assigned counsel, for the appellant (respondent mother).

*Evan O'Roark*, assistant solicitor general, with whom were *Kaelah M. Smith*, assistant attorney general, and, on the brief, *William Tong*, attorney general, for the appellee (petitioner).

** May 2, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Opinion*

SUAREZ, J. The respondent mother, Mirian R., appeals from the judgment of the trial court terminating her parental rights as to her biological daughter, Wendy G.-R., pursuant to General Statutes § 17a-112 (j) (3) (B) (i).[1] The respondent claims that (1) she was denied her due process right to the effective assistance of counsel, (2) the court improperly determined that the Department of Children and Families (department) made reasonable efforts to reunify her with Wendy, and (3) the court improperly determined that she was unable or unwilling to benefit from reunification services. We affirm the judgment of the trial court.

In its memorandum of decision, the court set forth the relevant facts and procedural history in this case: In January, 2014, "Wendy . . . was born in Guatemala to . . . [the respondent] and Santos G. [The respondent and Santos] speak only Spanish and understand little to no English. [Santos] attended three years of school in Guatemala and the [respondent attended] four years of school in Guatemala. [The respondent and Santos] read and write very little Spanish. In the fall [of] 2018, [Santos] and Wendy emigrated by bus from Guatemala to the Mexico/Texas border. [The respondent and Santos] decided to have four year old Wendy accompany [Santos] because it is easier for an adult to successfully cross the border if accompanied by a child. At the border, [Santos] surrendered himself and Wendy to the United States Immigration and Custom[s] Enforcement (ICE) authorities. [Santos and Wendy] were detained for two or three days and then released. [Santos] and

[1] In the underlying action, the court terminated the parental rights of both the respondent and Wendy's biological father, Santos G., as to Wendy. Santos has not appealed from that judgment. In this opinion, we refer to Mirian R. as the respondent. Unless necessary to our analysis of the claims raised by the respondent, in this opinion we need not and do not address the court's findings and conclusions with respect to Santos.

Wendy journeyed on by bus to New Haven, initially residing with relatives.

"In January, 2019, [Santos] and his uncle engaged in a physical altercation in New Haven. Both men had been drinking alcohol prior to the altercation. Wendy sustained head contusions during the fight and bystanders observed five year old Wendy walking down the street covered in beer and bleeding through the nose. The petitioner, the Commissioner of . . . Children and Families . . . was contacted and referred [Santos] for a substance abuse evaluation. By June, 2019, [Santos] and Wendy had moved three times and were then sharing a room in a rooming house.

"[Santos] sponsored[2] his Guatemalan cousin's entry into the United States and on or about June 19, [2019], [Santos] picked up his cousin, Juan Carlos G., from the airport. Juan Carlos took up occupancy in [Santos'] and Wendy's room in the rooming house. [Santos] never came home the night of June 22, [2019], and, therefore, Wendy was left alone in the room with Juan Carlos. On the morning of June 23, [2019], Wendy told [Santos that] she was afraid of remaining in their room without him and asked if she could go with him to work. [Santos] declined Wendy's request. Late on June 23, [2019], Wendy's babysitter brought Wendy to the emergency room after Wendy disclosed she had been sexually assaulted by Juan Carlos.[3]

"On June 24, [2019], [the petitioner] invoked an administrative, ninety-six hour hold and assumed temporary custody of Wendy. An order of temporary custody . . . soon followed, and, on September 12, 2019,

___

[2] "[Santos] defined sponsorship to mean that [he] was responsible for his cousin, Juan Carlos."

[3] "A medical examination revealed a tear to Wendy's hymen. In a forensic evaluation, Wendy disclosed [that Juan Carlos] had touched her vagina on two occasions with his hands and she reported other provocative statements by Juan Carlos. No arrests were ever made and [the respondent and Santos] report that Juan Carlos 'left' (presumably the New Haven area or the country) in August or November, 2022."

Wendy was adjudicated neglected[4] and committed to the petitioner's care. Wendy has remained continuously in [the petitioner's] care since June 24, 2019.[5]

"On March 9, 2021, the court approved a permanency plan of reunification with the respondent . . . in Guatemala. In January, 2022, [the petitioner] sought and obtained approval to amend the permanency plan [for] termination of parental rights and adoption. On January 11, 2022, given the change in permanency plans and [the respondent's] Guatemalan residency, the court, sua sponte, appointed [the respondent] legal counsel. [The respondent's] court-appointed attorney filed her appearance in the case on January 13, 2022. On March 14, 2022, [the petitioner] filed [a petition to terminate the] parental rights . . . [of the respondent and Santos] Both [the respondent and Santos] were properly served with the . . . [petition][6] and both were represented by [appointed] counsel throughout the termination proceedings.[7]

---

[4] "[In the neglect proceeding, Santos] was defaulted for his nonappearance on September 12, [2019]. In September, 2019, [the petitioner] had yet to effectuate service on [the respondent] in Guatemala, and, therefore, the adjudication of neglect and commitment order entered without prejudice to the respondent . . . . [Santos] credibly testified that he timely informed [the respondent] of Wendy's removal from his care."

[5] "Wendy has lived with her current foster family for the majority of her stay in foster care, except for a brief period of time when, due to the foster parents' medical concerns and the pandemic, Wendy was removed."

[6] "[The respondent] was served via publication and [Santos] was abode served."

[7] "The April 12, 2022 [termination of parental rights] plea hearing was a virtual proceeding and [the respondent] was defaulted for her nonappearance. However, given the [respondent's] out-of-country status, the court appointed [the respondent's] already assigned counsel to also represent [the respondent] for the purposes of the termination of parental rights petition. [The respondent] never appeared in court, in person or virtually, until the first day of the termination trial, March 8, 2023.

"[Santos'] initial [termination of parental rights] plea date was continued due to a lack of a Spanish interpreter. On May 17, 2022, [Santos] appeared and was advised in Spanish of his rights."

"On May 19, 2022, a competency evaluation of [Santos] was ordered by the court, and on September 22, 2022, [Santos] was found competent. In July, 2022, [the respondent] arrived in New Haven from Guatemala as an undocumented person. [The department] did not learn of [the respondent's] local presence until late July or August, 2022. Trial on the [termination of parental rights petition] commenced on March 8, 2023, continued on March 15, [2023], and [resumed] again to conclusion on March 31, 2023. Both [the respondent and Santos] appeared in person for the multiday . . . trial and both were assisted by court interpreters throughout the . . . trial.[8] The petitioner initially alleged that [Santos] had failed to [achieve a sufficient degree of personal rehabilitation] and that there exists no ongoing parent-child relationship between [the respondent] and Wendy. At the conclusion of the evidentiary portion of the . . . trial, the petitioner orally moved to amend the [petition] to add the adjudicatory ground of failure to rehabilitate as to [the respondent]. Absent objection and any request for a continuation,[9] the oral motion was granted, and, therefore, the adjudicatory date for purposes of the [termination of parental rights petition] is March 31, 2023.[10]" (Footnotes altered; footnotes in original; footnotes omitted.)

Thereafter, the court set forth its findings and legal conclusions with respect to the petition to terminate the respondent's parental rights as to Wendy. In the adjudicative phase of the proceeding, the court determined that the department had made reasonable efforts to reunify the respondent and Wendy. Alternatively,

---

[8] "Just prior to the commencement of trial on March 8, 2023, the court advised the [respondent and Santos] of their rights in accordance with *In re Yasiel R.*, 317 Conn. 773, [120 A.3d 1188] (2015)."

[9] "See Practice Book § 31a-1 (d)."

[10] "The termination [petition was] initially filed on March 14, 2022. A written motion to amend other aspects of the [petition] was granted on May 17, 2022."

the court determined that the respondent was either unwilling or unable to benefit from such reunification efforts. The court also determined that the petitioner proved that the respondent had failed to rehabilitate but that the petitioner had failed to prove that an ongoing parent-child relationship between the respondent and Wendy did not exist. In the dispositional phase of the proceeding, the court, guided by the considerations set forth in § 17a-112 (k), determined that it was in Wendy's best interest to terminate the respondent's parental rights as to her. Thereafter, the respondent appealed from the court's judgment terminating her parental rights as to Wendy.[11] We will set forth the court's analysis in more detail as necessary in the context of the claims raised in this appeal.

I

First, the respondent claims that she was denied her due process right to the effective assistance of counsel during the termination proceeding.[12] We are not persuaded.

The following additional facts are relevant to this claim. In the operative petition at the time of trial, the

[11] We note that the attorney for the minor child filed a statement pursuant to Practice Book § 67-13 indicating that he adopts the brief submitted by the petitioner.

[12] In her brief, the respondent states that she "does not believe that this case requires any further evidentiary findings in that both the deficient performance and prejudice are apparent upon an examination of the record as it exists." Nonetheless, in what she labels a matter for further review, the respondent claims that our Supreme Court's decision in *In re Jonathan M.*, 255 Conn. 208, 764 A.2d 739 (2001), "should be reconsidered to the extent that it established the appropriate options available to a respondent seeking to supplement the record in order to raise an ineffective assistance of counsel claim [in a termination of parental rights proceeding]." The respondent correctly acknowledges, however, that this court is bound by the precedent of our Supreme Court. See, e.g., *In re Kyreese L.*, 220 Conn. App. 705, 720 n.8, 299 A.3d 296 (this court is bound by Supreme Court precedent), cert. denied, 348 Conn. 901, 300 A.3d 1166 (2023). Thus, we merely note that the respondent has preserved this issue.

petitioner alleged, as grounds for termination of the respondent's parental rights, that there existed no ongoing parent-child relationship pursuant to § 17a-112 (j) (3) (D). On March 31, 2023, at the close of evidence, the court asked counsel: "[J]ust for clarity, what are the adjudicatory grounds that are alleged as to [the respondent]? 'Cause I only have no ongoing parent-child relationship." Counsel for the petitioner stated that she believed that the petition had been amended, but the court stated that it could not "find it." Following a recess, the petitioner's counsel made an oral motion to amend the petition by adding, with respect to the respondent, the ground of failure to rehabilitate pursuant to § 17a-112 (j) (3) (B) (i). The petitioner's counsel stated that the amendment was sought "to conform to the proof elicited at trial." The court asked if anyone wanted to "be heard" with respect to the amendment, to which counsel for the respondent and counsel for the minor child each indicated that they had no objection. Following this acquiescence to the amendment to the termination of parental rights petition, counsel did not further discuss the matter. The court thereafter heard closing arguments. As stated previously in this opinion, in its memorandum of decision, the court explicitly stated that it had granted the petitioner's motion to amend the termination of parental rights petition in the absence of an objection or any request for a continuance in the trial. The court also referred to Practice Book § 31a-1 (d).[13]

For the first time on appeal, the respondent argues that her counsel acted deficiently by failing to object

---

[13] Practice Book § 31a-1 (d) provides: "A petition or information may be amended at any time by the judicial authority on its own motion or in response to the motions of any party prior to any final adjudication. When an amendment has been so ordered, a continuance shall be granted whenever the judicial authority finds that the new allegations in the petition or changes in the information justify the need for additional time to permit the parties to respond adequately to the additional or changed facts and circumstances."

to the petitioner's oral motion to amend the termination of parental rights petition with respect to the respondent at the close of evidence, after all the parties had rested, to add an "entirely separate ground for termination," namely, failure to rehabilitate pursuant to § 17a-112 (j) (3) (B) (i). The respondent argues that "no reasonable attorney would have failed to object to the [petitioner] orally amending its petition in such a fundamental manner just prior to closing arguments." In arguing that counsel's conduct fell below the standard of reasonably effective assistance, the respondent contends that "there can be no argument that [her] counsel failed to object for some strategic reason that would insulate her deficient performance from scrutiny."

The respondent also argues that there can be no dispute that she was prejudiced by counsel's deficient performance because the court ultimately concluded that the petitioner had failed to prove the sole ground in the termination petition prior to the amendment— the lack of a parent-child relationship. The respondent argues that, "without the amendment to include the ground of failure to rehabilitate, the respondent's parental rights could not have been terminated." The respondent asserts that a proper objection "would likely have been sustained" at trial and, for this reason, "the respondent is able to meet the burden that the failure to object contributed to the termination of her parental rights." The respondent further contends that her counsel should have objected because principles of due process weigh against permitting the petitioner to essentially engage in "a shell game" by alleging one or more grounds in a petition to terminate parental rights and then, at the close of a trial, seeking to amend a petition to conform to the evidence presented at trial. According to the respondent, if her counsel had properly objected to and argued against the motion to amend, due process

considerations would have compelled the court to have sustained the objection.[14]

We next set forth the principles that guide our review. "Our Supreme Court has recognized that, '[i]n Connecticut, a parent who faces the termination of his or her parental rights is entitled, by statute, to the assistance of counsel. General Statutes § 45a-717 (b).' *In re Alexander V.*, 223 Conn. 557, 569, 613 A.2d 780 (1992). The Supreme Court further has held, consistent with that statutory right, that 'a parent in a termination of parental rights hearing has the right not only to counsel but to the effective assistance of counsel.' " (Footnote omitted.) *In re Danyellah S.-C.*, 167 Conn. App. 556, 567, 143 A.3d 698, cert. denied, 323 Conn. 913, 150 A.3d 228 (2016).

"In *State* v. *Anonymous*, 179 Conn. 155, 160, 425 A.2d 939 (1979), our Supreme Court set forth the following standard for determining whether counsel has been ineffective in a termination proceeding: 'The range of competence . . . requires not errorless counsel, and not counsel judged ineffective by hindsight, but counsel whose performance is reasonably competent, or within the range of competence displayed by lawyers with ordinary training and skill in [that particular area of the] law. . . . The [respondent] must, moreover, demonstrate that the lack of competency contributed to the termination of parental rights.' . . . 'A showing of incompetency without a showing of resulting prejudice . . . does not amount to ineffective assistance of counsel.' . . . *In re Matthew S.*, 60 Conn. App. 127, 132, 758 A.2d 459 (2000). 'In making such a claim, it is the responsibility of the respondent to create an adequate record pointing to the alleged ineffectiveness and any

---

[14] In her brief to this court, the respondent agrees with the petitioner, however, that the trial court properly granted the motion in the absence of any objection by her attorney.

prejudice the respondent claims resulted from that ineffectiveness.' *In re Christopher C.*, 129 Conn. App. 55, 59, 20 A.3d 689 (2011). In the absence of findings by the trial court in this regard, we directly review the trial court record. See *In re Dylan C.*, 126 Conn. App. 71, 90–91, 10 A.3d 100 (2011)." *In re Jah'za G.*, 141 Conn. App. 15, 35–36, 60 A.3d 392, cert. denied, 308 Conn. 926, 64 A.3d 329 (2013); see also *In re Alexander V.*, supra, 223 Conn. 570 (in considering merits of unpreserved claim that counsel in termination of parental rights proceeding rendered ineffective assistance, reviewing court undertook plenary review of trial court record).

We are mindful that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that [the] conduct [of trial counsel] falls within the wide range of reasonable professional assistance; that is, [an appellant] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Love* v. *Commissioner of Correction*, 223 Conn. App. 658, 668, 308 A.3d 1040, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024).

Although it is undisputed that the respondent did not raise the issue of ineffective assistance before the trial court, we note that, following the court's judgment, the respondent had an opportunity to develop a factual record related to counsel's allegedly deficient performance and any resulting prejudice. Our Supreme Court has explained "that General Statutes § 45a-719 provides a number of alternatives through which a parent may attempt to open the final judgment of termination and assert a claim of ineffective assistance of counsel. The

first option permits a motion to open the judgment in accordance with General Statutes § 52-212 or General Statutes § 52-212a. These provisions allow a four month window from the date of judgment within which such a motion may be brought.

"Second, the principles governing the opening of judgments at common law may also provide an indigent parent a means of gaining a review of the adequacy of trial counsel at the termination proceeding. It is a well-established general rule that even a judgment rendered by the court . . . can subsequently be opened [after the four month limitation] . . . if it is shown that . . . the judgment . . . was obtained by fraud . . . or because of mutual mistake. . . . Thus, when a judgment of termination is predicated on fraud or mutual mistake and the indigent's appointed counsel fails to address these issues, presumably rendering the assistance ineffective, the parent may have a remedy to open the judgment at common law.

"Finally . . . a parent may file a petition for a new trial. See General Statutes § 52-582. Under this option, a parent whose rights have been terminated has three years within which to file a petition. General Statutes § 52-270 provides that the court may grant such a petition for reasonable cause. Although we express no opinion as to whether a colorable claim of ineffective assistance of counsel always will require a court to grant a petition for a new trial under § 52-582, we note that this court has long recognized that [t]he causes for which new trials may be granted . . . are only such as show that the parties did not have a fair and full hearing at the first trial; and the words or for other reasonable cause, mean other causes of the same general character . . . ." (Citation omitted; footnotes omitted; internal quotation marks omitted.) *In re Jonathan M.*, 255 Conn. 208, 236–39, 764 A.2d 739 (2001).

The respondent did not avail herself of any of the foregoing opportunities to develop a record of her counsel's allegedly deficient performance or the prejudice, if any, that resulted from such performance. As stated previously in this opinion, however, she argues that the record amply demonstrates that counsel acted deficiently and that counsel's lack of competency contributed to the termination of her parental rights. See footnote 12 of this opinion.

Because the claim of ineffective assistance arises from trial counsel's response to the petitioner's motion to amend, we observe that amendments to petitions to terminate parental rights are permitted by our rules of practice. Practice Book § 34a-1 (d) provides: "A petition may be amended at any time by the judicial authority on its own motion or in response to a motion prior to any final adjudication. When an amendment has been so ordered, a continuance shall be granted whenever the judicial authority finds that the new allegations in the petition justify the need for additional time to permit the parties to respond adequately to the additional or changed facts and circumstances." An appellate court reviews a trial court's decision to grant a motion to amend for an abuse of discretion, and discretion is properly exercised when a court appropriately rules on any request made for additional time to respond adequately to new allegations. See, e.g., *In re Carl O.*, 10 Conn. App. 428, 437–38, 523 A.2d 1339 (concluding that trial court did not abuse its discretion in granting petitioner's request to amend termination of parental rights petition when request was made on eve of trial and court had offered to grant respondents continuances for purpose of responding to amendment), cert. denied, 204 Conn. 802, 525 A.2d 964 (1987), and cert. denied, 204 Conn. 802, 525 A.2d 964 (1987).

For the reasons previously discussed herein, the record is bereft of any evidence of the *actual* strategy,

if any, that the respondent's counsel employed when she did not object to the petitioner's eleventh hour motion to amend the petition. In this circumstance, we, as a reviewing court, are mindful of the presumption that counsel acted reasonably, and we must contemplate possible strategic reasons that might have supported counsel's challenged actions before considering whether those actions were objectionably reasonable. This is the proper analytical path that governs claims of ineffective assistance of counsel in habeas corpus proceedings in which the record does not contain evidence of the actual trial strategy, if any, underlying trial counsel's challenged conduct. See, e.g., *Jordan* v. *Commissioner of Correction*, 341 Conn. 279, 290, 267 A.3d 120 (2021) ("when trial counsel is not available to testify . . . the court must contemplate the possible strategic reasons that might have supported the challenged action and then consider whether those reasons were objectively reasonable"); *Roman* v. *Commissioner of Correction*, 223 Conn. App. 111, 135, 307 A.3d 934 (2023) ("[A]lthough [appellate counsel] did not present arguments about the petitioner's mental health and competence on direct appeal, the petitioner did not call [appellate counsel] to testify at the habeas trial to explain why, and the petitioner did not offer any other evidence of [appellate counsel's] reasons for choosing which claims to raise on direct appeal. In the absence of such evidence, the petitioner did not otherwise meet his burden of overcoming the strong presumption that [appellate counsel] exercised reasonable professional judgment."), cert. denied, 348 Conn. 952, 308 A.3d 1039 (2024); *Godfrey-Hill* v. *Commissioner of Correction*, 221 Conn. App. 526, 543–44, 302 A.3d 923 (when trial counsel cannot recall trial strategy, court must "affirmatively entertain the range of possible reasons [that] counsel may have had for proceeding as [he] did" (internal quotation marks omitted)), cert. denied, 348 Conn.

929, 304 A.3d 861 (2023); *Crocker* v. *Commissioner of Correction*, 220 Conn. App. 567, 585, 300 A.3d 607 ("although not automatically fatal to a petitioner's claim, failure to elicit testimony from counsel about trial strategy renders it less likely that the petitioner can prevail with respect to his burden to demonstrate deficient performance"), cert. denied, 348 Conn. 911, 303 A.3d 10 (2023); *Bush* v. *Commissioner of Correction*, 169 Conn. App. 540, 550, 151 A.3d 388 (2016) ("There is a strong presumption that counsel has rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . . Just as the decision of trial counsel not to object to certain evidence is a matter of trial tactics, not evidence of incompetency . . . the tactical decision of appellate counsel not to raise a particular claim is ordinarily a matter of appellate tactics, and not evidence of incompetency, in light of the presumption of reasonable professional judgment." (Internal quotation marks omitted.)), cert. denied, 324 Conn. 920, 157 A.3d 85 (2017). We see no reason, and the respondent has not cited any relevant authority to the contrary, why this analytical path should not apply to the present claim of ineffective assistance of counsel.

Contrary to the respondent's arguments on appeal, because Practice Book § 34a-1 (d) permits amendments at any time prior to any final adjudication, the fact that the petitioner sought to amend the petition at the close of evidence was not, in and of itself, a reasonable ground on which to object to the petitioner's motion. The respondent also strongly emphasizes that counsel should have advanced due process concerns as the grounds for objecting to the motion. As the respondent correctly observes, the fundamental pillars of due process encompass adequate notice of the grounds on which the petitioner relies so that the respondent has "a reasonable opportunity to prepare" and a right to

be heard. See *In re P. T.-W.*, 223 Conn. App. 571, 584–85, 309 A.3d 394 (2024) ("[i]t is the settled rule of this jurisdiction, if indeed it may not be safely called an established principle of general jurisprudence, that no court will proceed to the adjudication of a matter involving conflicting rights and interests, until all persons directly concerned in the event have been actually or constructively notified of the pendency of the proceeding, and given reasonable opportunity to appear and be heard" (internal quotation marks omitted)). Nevertheless, § 34a-1 (d) does not, as the respondent suggests, condone "a shell game . . . ." It permits the petitioner to amend the petition, thereby giving the respondent actual notice of the statutory grounds for termination of parental rights on which it intends to rely.[15] It also provides a clear mechanism to protect the respondent's right to prepare and be heard by requiring the court to afford the respondent additional time to respond adequately to the additional or changed facts and circumstances.[16] See Practice Book § 34a-1 (d).

[15] In this regard, we note that Practice Book § 34a-1 (d) uses the word "shall," thus triggering a mandatory duty on the part of the court to afford a respondent the time necessary to respond adequately to any amendments. See, e.g., *In re Adrien C.*, 9 Conn. App. 506, 509, 519 A.2d 1241 (observing for purposes of statutory interpretation that "the word 'shall' is generally determined to be mandatory"), cert. denied, 203 Conn. 802, 522 A.2d 292 (1987).

[16] As our Supreme Court has observed, "[i]t is well established that a person in jeopardy of having his or her parental rights terminated has a constitutional due process right to adequate notice of the grounds for termination. . . . Notice is not a mere perfunctory act in order to satisfy the technicalities of a statute, but has, as its basis, constitutional dimensions. An elementary and fundamental requirement of due process in any proceeding [that] is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. . . . Notice, to comply with due process requirements, must be given sufficiently in advance of scheduled court proceedings so that [a] reasonable opportunity to prepare will be afforded, and it must set forth the alleged misconduct with particularity. . . . [T]here is no violation of due process when a party in interest is given the opportunity at a meaningful time for a court hearing to litigate the question [at issue]." (Citations omitted; internal quotation marks omitted.) *In re Gabriel S.*, 347 Conn. 223, 232–33, 296 A.3d 829 (2023).

With respect to the present claim, the respondent, in order to satisfy her burden of proving that counsel rendered deficient representation, must do more than demonstrate that counsel failed to object to the motion to amend. Instead, she must demonstrate that counsel's failure to object cannot be explained by one or more possible strategic reasons that are objectively reasonable. The respondent cannot satisfy that burden. It appears that the only legally viable ground on which the respondent's counsel might have objected was, as the respondent suggests, on the ground that the amendment amounted to unfair surprise and that she needed additional time to respond adequately to the failure to rehabilitate ground. If counsel pursued such an objection, however, the remedy to which the respondent would have been entitled was additional time.

Such an objection does not appear to be objectively reasonable in the present case because, as the respondent acknowledges before this court, the record reflects that, prior to the motion, the petitioner presented evidence related to the failure to rehabilitate ground. We briefly observe that, at the time of the trial, although the petition set forth the sole ground of no ongoing parent-child relationship, the petitioner nonetheless presented a copy of the respondent's court-ordered specific steps to facilitate the respondent's reunification with Wendy. The petitioner also presented a permanency plan study dated September 30, 2022, which supported a finding that the respondent had failed to satisfy her specific steps and, thus, had failed to rehabilitate. In the absence of any objection, the petitioner presented testimony from a department social worker with respect to numerous unresolved issues that could interfere with the respondent being able to safely assume a responsible position in Wendy's life. There was evidence that, in 2022, the respondent's youngest child

was found outdoors, at night, in a city street. The petitioner also presented testimonial evidence from a department social worker that was relevant to the issue of the respondent's failure to rehabilitate.

Furthermore, the record reflects that the respondent's counsel challenged the failure to rehabilitate ground through cross-examination and by presenting evidence of the respondent's rehabilitative efforts. For example, during cross-examination of the social worker, the respondent's counsel elicited testimony from the social worker that tended to demonstrate that the respondent's residence was clean and that she had satisfied her specific step requiring her to consistently visit with Wendy. The respondent also testified with respect to the 2022 incident, in which she allegedly had failed to adequately supervise her youngest child. The respondent testified that, while she was cooking food, the child had wandered off briefly and was found at the edge of a city street.

The petitioner presented testimony from Tina Schiappa, an expert in clinical and forensic psychology who had evaluated the respondent. Several portions of Schiappa's examination pertained to the respondent's failure to rehabilitate. Schiappa testified that she had evaluated the respondent's "ability to parent." Without objection, counsel for the petitioner asked Schiappa whether she believed that the respondent "ha[d] rehabilitated to the point where Wendy could be returned to her care today?" Schiappa replied in the negative. Counsel for the petitioner also asked Schiappa, "[G]iven the age and needs of Wendy, do you think [the respondent] should be given more time to achieve . . . that level of understanding that she could get through counseling and classes . . . in order for Wendy to be safely reunified with her?" Schiappa opined that it was not "fair" for Wendy to have to wait for that and that she did not believe that the respondent should be given

additional time. Moreover, during the cross-examination of Schiappa, the respondent's counsel attempted to undermine these opinions in various ways. Counsel for the respondent also asked Schiappa questions that were relevant to the respondent's alleged failure to rehabilitate, such as whether she believed that the respondent should have been afforded "a little bit more time . . . once she got here to do services?"

An examination of the record reflects that, without objection at trial, the petitioner presented evidence that was relevant to the issue of whether the respondent had failed to rehabilitate. The respondent's counsel attempted to undermine this evidence throughout the trial. Unless the respondent's counsel had new evidence to present with respect to the failure to rehabilitate ground, believed that additional examination of the petitioner's witnesses would be beneficial to dispute the new ground, or she simply needed additional time to prepare for closing argument, it would not have been a reasonable trial strategy to object to the motion to amend the petition for the purpose of seeking additional time. The respondent has failed to present any evidence as to what additional steps her counsel could or should have taken had she been given additional time in which to respond to the new ground. In fact, the respondent does not assert that her counsel should have presented any additional evidence or that additional time was necessary to prepare stronger arguments to refute the failure to rehabilitate ground. For these reasons, we are not persuaded that counsel's failure to object to the petitioner's motion to amend was objectively unreasonable under the circumstances of this case.

Even if the respondent could satisfy her burden of demonstrating that it was objectively unreasonable for her counsel not to object to the motion to amend on the basis of the only ground on which she could object, namely, that she needed more time to defend against the

new adjudicative ground, she has failed to demonstrate that she suffered prejudice in that counsel's incompetency contributed to the loss of her parental rights. In the present case, the respondent does not present us with a record to demonstrate what additional evidence or argument her counsel should have presented if she had asked for additional time to respond to the amendment. In fact, she does not even argue that there was anything that her counsel should have done differently to respond to the amendment.[17] Instead, the respondent argues that prejudice is readily apparent in this case because the court ultimately relied on the failure to rehabilitate ground. For the reasons already discussed in this opinion, that argument is fundamentally flawed. The respondent's argument overlooks the fact that our rules of practice permit the petitioner to amend a termination of parental rights petition at any time prior to a final adjudication of the petition, provided that the respondent is afforded additional time as necessary to respond to the amendment. See Practice Book § 34a-1 (d). As we have already concluded, the respondent has not demonstrated that it was objectively unreasonable for her counsel not to request additional time in light of the facts of this case.

---

[17] With respect to this type of a claim, a respondent is unable to demonstrate that he or she suffered prejudice simply because the court subsequently rendered an adverse judgment. See, e.g., *In re Gabriel S.*, 347 Conn. 223, 238, 296 A.3d 829 (2023) ("[t]o the extent that the respondent claims that he did not receive adequate notice that his failure to rehabilitate would be one of the grounds for terminating his parental rights when the trial continued because it was possible that the petitioner would proceed under [§ 17a-112 (j) (3) (B) (i)], any constitutional violation was harmless beyond a reasonable doubt because he makes no claim that there was additional evidence on that issue that he would have presented if he had received adequate notice"); *In re Ivory W.*, 342 Conn. 692, 732 n.6, 271 A.3d 633 (2022) (suggesting that, even if trial court improperly denied motion for continuance in termination of parental rights proceeding, denial was harmless because "the respondent [mother never] explained how the testimony that she would have given if the trial court had granted her motion for a continuance would have affected the outcome of the termination proceeding").

On the basis of the foregoing, we reject the respondent's claim that her trial counsel rendered ineffective assistance at the termination of parental rights trial.

## II

The respondent next raises two claims of error related to the court's determinations made pursuant to § 17a-112 (j) (1). Specifically, the respondent claims that the court improperly determined that (1) the department made reasonable efforts to reunify her with Wendy, and (2) she was unable or unwilling to benefit from reunification efforts.[18] We conclude that the court properly determined that the respondent was unable or unwilling to benefit from reunification efforts. Given our resolution of this claim, it is unnecessary for us to consider the merits of her claim that the department failed to make reasonable efforts to reunify the respondent and Wendy.[19]

---

[18] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the [department] has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[19] Our Supreme Court has stated that, "[b]ecause the two clauses [of § 17a-112 (j) (1)] are separated by the word 'unless,' this statute plainly is written in the conjunctive. Accordingly, the department must prove *either* that it has made reasonable efforts to reunify *or, alternatively*, that the parent is unwilling or unable to benefit from reunification efforts. . . . [E]ither showing is sufficient to satisfy this statutory element." (Emphasis in original.) *In re Jorden R.*, 293 Conn. 539, 552–53, 979 A.2d 469 (2009).

We begin by setting forth additional findings of the court. Even though, as we have stated, we need not consider the merits of the respondent's claim regarding the reasonableness of the efforts made by the department to reunify her with Wendy, we nevertheless set forth the court's findings and conclusions concerning those efforts because those efforts are relevant to the claim that the court improperly determined that she was unable or unwilling to benefit from the department's rehabilitative efforts. "[The department] made reasonable efforts to locate [the respondent]. As noted above, [the respondent] (who was pregnant with Yeni[20] at the time [Santos] and Wendy left Guatemala in 2018) remained behind in Guatemala. [Santos] provided [the department] with [the respondent's] cell phone number in Guatemala and credible testimony revealed that various [department] social workers assigned to the case from mid-2019 to December, 2021, had contact, albeit limited and intermittent . . . with [the respondent], via cell phone or through the use of the WhatsApp app (a free virtual communication platform commonly used to video chat and/or text, particularly overseas).

"[Santos] testified that [the respondent] *always* had access to a cell phone in Guatemala and he would video call [the respondent] during his weekly in-person supervised visitation sessions with Wendy so that [the respondent] and Wendy could visit with one another. [The respondent] also testified that [Santos] would video call her during his weekly visits with Wendy and Wendy and [the respondent] virtually connected with one another. [The respondent] also had some degree of cellular or video communication, independent from [the department], with Wendy and Wendy's foster family.

---

[20] The court found that Yeni is Wendy's younger sister and that Yeni immigrated with the respondent to New Haven in July, 2022.

"In July, 2019, Attorney Jennifer Avenia, the Director of Immigration Practice for [the department], was consulted for her expertise on how the [department] could best serve the family. [Avenia's] recommendations in this case included (1) referrals for local services to assist [Santos] and Wendy, (2) securing Wendy special immigrant juvenile status,[21] and (3) exploring the potential reunification of Wendy with [the respondent] in Guatemala.

"The potential reunification of [the respondent] and Wendy in Guatemala required pursuing a study of [the respondent] and the family's Guatemalan home. [The department] reached out to International Social Services (ISS-USA) to conduct the out-of-country study. In December, 2019, ISS-USA shared a completed study with [the department], which recommended [that] Wendy be reunified with [the respondent] in Guatemala.

"The family's home[22] is located in Jocotán, Guatemala. Jocotán is a rural village or municipality in the Chiquimula department of Guatemala. [Avenia] credibly testified [that] Jocotán is not far from the Honduras border, Guatemala experiences a high homicide rate, and Chiquimula has the third highest homicide rate in all of Guatemala. Additionally, Guatemala's rainy season spans from approximately May to October, and roadways in and around Jocotán, Chiquimula are dirt roads which can wash out in the rainy season, thereby making road travel only possible with SUV-like vehicles. [The respondent] does not own a motor vehicle, and, according to the ISS-USA report (which was not placed in evidence nor shared with the court), [the respondent's] available modes of transportation [are] by foot or horseback. Nonetheless, [the respondent] credibly

[21] "Special juvenile immigration status potentially affords Wendy a path to United States citizenship."

[22] "The family home in Guatemala is a single dirt floor room. The home has no indoor plumbing. Beds are rope woven entities."

testified that a bus ride she undertook in 2019 from her Jocotán home to Guatemala City (the country's capital) took twelve hours. An international airport is located just outside Guatemala City. [Avenia] testified that the United States State Department categorizes Guatemala as a country in which travelers from abroad should 'reconsider travel.'[23]

"Given ISS-USA's December, 2019 recommendation of reunification, in early 2020, [the department] attempted to formulate a plan to safely return Wendy to [the respondent] in Guatemala. [Avenia] was told that Wendy's passport was lost or stolen or taken at the Mexico/Texas border. In reality, Wendy was never issued a passport. In an attempt to arrange for Wendy's legal entry back into Guatemala in 2020, [the department] reached out to the Guatemalan consulate seeking a passport for Wendy. However, the Guatemalan government engaged in only minimal contact with [the department]. Ultimately, sometime between April and June, 2020, the Guatemalan government issued Wendy a one-way travel visa into Guatemala.[24]

---

[23] "The court takes judicial notice of the United States Travel Advisory System, which is comprised of four levels. Level 1 recommends exercising normal precautions, Level 2 recommends exercising increased caution, Level 3 recommends reconsidering travel, and Level 4 recommends do not travel. Guatemala is a Level 3 country."

[24] "[The respondent] testified that, while pregnant with her daughter, Yeni (born [in] 2019), [the respondent] traveled by bus from her Jocotán home to Guatemala City to obtain a passport for Wendy. ([The respondent] was unsuccessful in procuring Wendy a passport.) The [respondent and Santos] sought to obtain a passport for Wendy in 2019 because they wanted Wendy to return to [the respondent's] care in Guatemala (apparently with [Santos] remaining in the United States). [Santos] credibly testified that [he and the respondent] reconsidered that decision as Wendy began speaking and understanding more English than Spanish. [The respondent] expressed to [Santos] a concern that if Wendy were to return to her care in Guatemala, [the respondent] would not be able to understand what Wendy was saying in English.

"The Guatemalan government's meager responses to [the department's] overtures and the Guatemalan consulate's 2020 decision to only issue Wendy a one-way visa appears to have been driven, in whole or in part, by the

"Thereafter, [the department] assessed the options of sending Wendy, accompanied by a [department] social [worker], to Guatemala and/or sending six year old Wendy unaccompanied to Guatemala. Formulating a plan to return Wendy to [the respondent] in Guatemala in mid-2020 included navigating the global challenges attendant to the COVID-19 pandemic. After carefully considering the profound health risks associated with traveling abroad in the pandemic, and the State Department's travel advisory warning, and the homicide rate in Guatemala (and, particularly, in the department of Chiquimula), [the department] concluded any attempt to return Wendy to Guatemala in 2020 posed unacceptable health and safety risks to Wendy and [department] staff.[25]

COVID-19 pandemic. It is noteworthy that, had the [respondent and Santos] secured a passport for Wendy prior to the pandemic or prior to Wendy's and [Santos'] 2018 departure from Guatemala, [the department] could have contemplated flying Wendy into Guatemala secure in knowing that if [the respondent] did not timely appear at the Guatemalan airport, Wendy could return to the United States and remain in [the petitioner's] custody."

[25] "A[n] extremely compelling concern for [the department] in 2020 was whether [the respondent] would/could actually timely appear at the Guatemalan airport to assume physical custody of Wendy. In 2020, [the respondent] was not maintaining reliable or consistent contact with [the department]. Per [the respondent], it is a twelve hour bus ride from her home to Guatemala City and, as noted previously, the airport is located just outside of the capital city. [The department] was justified in its decision that it was not appropriate for [department] social workers to travel with Wendy from the Guatemalan airport to Jocotán, assuming road travel was even possible. As noted . . . the Guatemalan government's one-way visa precluded Wendy from returning to the United States once she entered Guatemala. As discussed previously, [the department] had justified concerns about the safety and well-being of their [department] social workers staying indefinitely anywhere in Guatemala, both due to the health risks posed by the pandemic in 2020 and the physical safety of travelers to Guatemala given the State Department's rating. [The department] also vetted a contingency plan of turning Wendy over to Guatemalan child protection officials if [the respondent] did not appear. [The department] appropriately concluded [that] subjecting Wendy to Guatemala's less than robust foster care system, in the midst of a global pandemic, with a military that is known for seeking and obtaining bribes, was not in Wendy's best interests."

"In early 2022, [Avenia] recommended the 2019 ISS-USA study be updated/repeated to determine if reunification with [the respondent] in Guatemala was a viable possibility in 2022.[26] When ISS-USA attempted to make contact with [the respondent] in Guatemala in 2022, [the respondent] could not be contacted or located. Unbeknownst to ISS-USA and to [the department], [the respondent] left Guatemala with her younger daughter, Yeni, paying a 'coyote'[27] to secure her and Yeni's passage to the Mexico/Texas border. Although [the respondent] and Yeni arrived in New Haven on or about July 10, 2022, [the department's] first 2022 contact with [the respondent] did not occur until [the respondent] appeared, unannounced, at an in-person supervised father-daughter visit in August, 2022. [The respondent] testified she did not reach out to [the department] prior to her August, 2022 appearance at the father-daughter supervised visit because she did not have a cell phone.[28]

"In September, 2022, [the department] referred [the respondent] to [Integrated Refugee and Immigrant Services (IRIS)]. For an immigrant's first two years in New Haven, IRIS will work with individuals requiring assistance. By November, 2022, [the respondent] had yet to engage with the IRIS worker. The IRIS worker therefore reached out to [the respondent's] counsel. IRIS was able to finally convince [the respondent] to meet and IRIS conducted its first home visit with [the respondent]

---

[26] "By 2022, the 2019 ISS-USA study had expired."

[27] This court previously has observed that "coyote" is a slang word that refers to "a person paid to guide children . . . and other persons to and across the United States border." *In re Pedro J. C.*, 154 Conn. App. 517, 523 n.4, 105 A.3d 943 (2014), overruled in part on other grounds by *In re Henrry P. B.-P.*, 327 Conn. 312, 173 A.3d 928 (2017).

[28] "Again, according to [Santos], [the respondent] 'always' had cellular and/or virtual platform communication accessibility in Guatemala. It is unknown what [the respondent's] cell phone access was en route to the United States. However, what is known, is that upon arriving in New Haven in mid-July, 2022, [the respondent] and her younger daughter, Yeni, resided with [Santos] and [Santos] had cell phone/virtual platform capability."

in December, 2022. [The respondent] continued to be unwilling to share necessary background information with IRIS and [the respondent] would not engage with IRIS. It took [approximately five] months for the IRIS worker to establish a trusting, working relationship with [the respondent].[29] Since February, 2023, IRIS has been assisting [the respondent] and [the respondent] is engaging with the IRIS worker.

"In late August, 2022, New Haven police responded to a call that Wendy's three year old sister, Yeni, had been found unsupervised standing/walking in the streets of New Haven. When [the respondent] appeared at the scene, [the respondent] appeared to be under the influence. She was arrested for risk of injury [to a child].[30]

"After Yeni was found unsupervised in the street, [the department] referred [the respondent] for a substance abuse evaluation and there were no recommendations for follow-up treatment. [The department] also referred [the respondent] to [Intensive Family Preservation (IFP)], an in-home, parenting education and coaching service. The IFP worker continues to partner with IRIS to encourage [the respondent] to engage with IRIS and in obtaining community based social and legal services.

"Since August, 2022, [the respondent] and Wendy have enjoyed weekly supervised visits facilitated by [the department] and/or a supervised visitation center. Both [the respondent and Santos] . . . participate in the family visits with Wendy. At times during the visits, the family requires the assistance of an interpreter.[31] [Santos] testified that Wendy speaks a lot more English

---

[29] "The IRIS worker credibly testified that, in her experience, distrust and a reluctance to engage is not uncommon with the population she works with."

[30] "The criminal case was eventually dismissed."

[31] "[Department] social worker [Kelly] Tibault testified that, if a Spanish speak[ing] worker or interpreter is not present at the supervised visits, the Google Translate app is utilized."

than she does Spanish. According to [Santos], Wendy's lack of fluency in Spanish played a part in [his and the respondent's] reconsidering sending Wendy back to [the respondent's] care in Guatemala. Reportedly, Wendy understands spoken Spanish more than she can speak it, and she requires a translator for some of her verbal exchanges with [Santos and the respondent]. To enhance communication between [Santos, the respondent] and Wendy, [the department] explored enrolling Wendy in Spanish language classes. Wendy declined Spanish language classes, claiming she learns better (Spanish) listening to her bilingual foster parents (and foster siblings) speak Spanish at home.

"From July, 2022, to February, 2023, [the respondent] and Yeni primarily resided with [Santos] in a rooming house on Kimberly Avenue in New Haven. . . . [T]he rooming house's common area was observed to have sticky floors, bugs, and cockroaches.[32] [The department] attempted to screen the other rooming house tenants and view their individual rooms. Presumably because of the tenants' undocumented status, some refused to interact with [the department] and [the department] could not adequately vet the other occupants or assess the physical structure of the rooming house (as to potential safety or hazardous issues applicable to a three year old). In mid-February, 2023, [the respondent] and Yeni began renting a room from an unrelated male acquaintance in another rooming house in New Haven, which [the department] assesses is appropriate for [the respondent] and Yeni.

"[The respondent] works as an undocumented worker at a Mexican restaurant. [The respondent] and

---

[32] "The house refrigerator contained mold and had a foul odor. Like [Santos and the respondent], [the department] surmised that the others in the rooming house work in the food service-restaurant business and their dietary needs, in large part, are met with 'take-out' food, presumably from where they work."

Yeni subsist in part on food from the restaurant and food donations from providers such as IRIS. One of the social/parenting issues IRIS and IFP were addressing with [the respondent] as recently as February and March, 2023, is the importance of securing safe and responsible child care for Yeni when [she is] not in [the respondent's] care.[33]

"Wendy was referred for mental health treatment to address the trauma and uncertainties she experienced in her young life, the journey to this country and ICE detention, the physical violence she witnessed and experienced while living with [Santos] in 2019, the sexual assault she endured by Juan Carlos . . . and [Santos'] failure to keep her safe, her removal from [Santos'] care and entry into foster care, and the substantive loss of contact with [the respondent] from the latter part of 2018 to August, 2022. Wendy last discharged successfully from counseling in November, 2022. By all accounts, Wendy is an outgoing, resilient, and healthy child.

"The testimony and evidence reflect that, from 2019 through the end of 2021, [the respondent] had limited, sporadic contact with the various assigned [department] social workers and [the respondent] joined in virtually on [Santos'] and Wendy's supervised visitation sessions. In December, 2021, through August, 2022, [department] social worker [Kelly] Tibault unsuccessfully attempted contact with [the respondent], either directly 'dialing' the cell phone number provided by [Santos] or through the use of the WhatsApp messenger app. . . . Tibault routinely texted [the respondent] through the WhatsApp platform. [The respondent] did not respond.

---

[33] "In January, 2023, [the petitioner] filed a neglect petition as to Yeni. Said neglect petition remain[ed] pending [at the time of the trial court's judgment]."

"[The department] was unaware of [the respondent's] 2022 emigration from Guatemala until after [the respondent's] July, 2022 arrival to New Haven. It may be [that the respondent's] lack of communication with [the department] in 2022 was tied to her decision to emigrate and the actual journey to Connecticut. Nonetheless, when ISS-USA attempted to connect with [the respondent] to complete an updated and/or second home study in 2022, [the respondent] could not be contacted or located. [The department] did not become aware of [the respondent's] and Yeni's July, 2022 arrival to New Haven until very late July/early August, 2022, and by late August, 2022, [the department] began attempting to engage with [the respondent] and to refer [the respondent] to IRIS, IFP, substance abuse evaluation, and weekly supervised visitation sessions with Wendy.[34]

"Case law is clear [that] reasonable efforts is defined as doing everything reasonable, not everything possible. Clearly, the barriers to reunifying Wendy with [the respondent] in Guatemala could not be mitigated in 2020. However, had [the respondent] responded to [the department's] repeated attempts to communicate with her in 2022, and had [the respondent] made herself available for the second ISS-USA study in Guatemala, returning Wendy to Guatemala in 2022 (as the world emerged from the constraints of the pandemic) may have been possible (assuming a favorable and current ISS-USA study).

"Since [the respondent's] and Yeni's August, 2022 arrival to New Haven, [the department] has attempted to work with [the respondent], both in maintaining Yeni safely in [the respondent's] care and in supporting/nurturing [the respondent's] relationship with Wendy. In

---

[34] "It is of no moment to the court's reasonable efforts analysis that [the department's] efforts to engage with [the respondent] in August, 2022, were not isolated to just Wendy and [the respondent], but also included services and providers applicable to Yeni and [the respondent]."

addition to weekly supervised parent-child visitation, [the department] has connected [the respondent] to IRIS and to [IFP] services. [The department] has diligently remained cognitive of the significant language and cultural barriers attendant to the case and [the department] has consistently worked around and through both [Santos' and the respondent's] substantive illiteracy and language fluency challenges. Additionally, [the department] sought a court-ordered psychological evaluation and parent-child interactional. Accordingly, the court finds that [the department] made reasonable efforts to reunify [the respondent] and Wendy." (Emphasis in original; footnotes added; footnotes altered; footnotes in original; footnotes omitted.)

With respect to whether the respondent was unable or unwilling to benefit from the reunification efforts made by the department, the court set forth the following findings and conclusions: "[T]he court finds that [the respondent] is unable to benefit from reunification efforts. As noted previously, [the respondent] communicated and/or virtually interacted with Wendy and [Santos] and with the foster family at least from 2019 to the end of 2021.[35] Although [the respondent's] perhaps culturally derived distrust of others (as testified to by the IRIS worker) and her decision to attempt to immigrate to the United States and her journey to Connecticut may have factored into [the respondent's] 2022 incommunicado stance with [the department], that reality rendered [the respondent] unable or unwilling to benefit from reunification efforts.

"The court is not indifferent to the fact that [the respondent] and Yeni undertook an arduous and uncertain journey to reunify with Wendy and [Santos] in

---

[35] "Although it is not clear, a careful review of [the testimony of the respondent and Santos] suggests [that the respondent] participated in virtual visits with Wendy during [Santos'] supervised visitation sessions beyond the end of 2021."

2022. Unfortunately, [the respondent's] failure to timely inform [the department] of her presence in New Haven, and then her subsequent resistance to engage with providers until just recently, detrimentally delayed [the respondent] in the opportunity [to] gain critical and necessary knowledge and insight as to what constitutes safe and nurturing parenting in an urban American city.[36]

"Inexplicably, [the respondent] does not endorse or accept Wendy's truth of being sexually assaulted by Juan Carlos while in [Santos'] care in 2019. At the January, 2023 court-ordered parent-child interactional conducted by [Schiappa], [the respondent] asked then nine year old Wendy (a sexual assault victim) if she (Wendy) had a boyfriend. To be sure she understood [the respondent's] question, Wendy asked [Schiappa] to translate [the respondent's] question into English. [Schiappa] credibly testified [that] Wendy was shocked at [the respondent's] sincerely and seriously asked question. [The respondent's] boyfriend question is emblematic of [the respondent's] lack of insight into and appreciation for Wendy's past victimization. Until and unless [the respondent was] to exhibit an ability to validate Wendy's traumas (physical abuse, sexual abuse, [Santos'] neglect and failure to protect, removal from [Santos'] care and entry into and protracted stay in foster care), continued reunification efforts are of limited, if any, value.

"The court credits [Schiappa's] testimony that, given that [the respondent] had been living in New Haven for only six months at the time of the January, 2023 psychological evaluations, perhaps [the respondent] could benefit from additional time to gain insight and understanding as to why Wendy had come into foster

---

[36] "To [the respondent's] credit, she has recently start[ed] receiving positive parenting reports from her IFP worker."

care, and why Wendy remained in foster care, and the foreseeable challenges or issues for Wendy if she were to leave her long-term foster [care] family and [return] home to [the respondent's] care. However, in the additional months since [Schiappa's] evaluation, [the respondent's] lack [of] insight and understanding continues unabated. For all of those reasons, the court finds that, in addition to [the department] having made reasonable efforts to reunify [the respondent] and Wendy, [the respondent] is unable or unwilling to benefit from reunification efforts." (Footnotes altered; footnote omitted.)

The court later set forth additional findings concerning the respondent's inability to benefit from the department's reunification efforts: "When asked what [the respondent] needed to do for reunification to be possible, [Schiappa] credibly testified [that the respondent] would need to (1) provide a sufficient and safe living space for her and her children, (2) demonstrate insight, knowledge and proficiency in safely caring for a nine year old while also caring for a three year old, (3) exhibit meaningful insight about how [the respondent's] decisions and behaviors have impacted Wendy, (4) be accepting of Wendy's truth regarding the sexual assault, [and] (5) acknowledge the other traumatic events Wendy has experienced and how said trauma(s) have impacted Wendy and may continue to impact Wendy in the future."

With respect to the respondent's claim that the court improperly determined, pursuant to § 17a-112 (j) (1), that she was unable or unwilling to benefit from the department's efforts to reunify her and Wendy, we observe that she does not challenge any of the court's specific subordinate findings as clearly erroneous. Instead, the respondent broadly challenges the court's ultimate determination, which was based on those subordinate findings, that she was unwilling or unable to

benefit from the department's reunification efforts. She asserts, contrary to the court's assessment of her conduct, that the evidence demonstrated that, as of the time of the trial, she had "positively engaged" with the services that the department offered to her, which included IRIS, a psychological evaluation, a substance abuse evaluation, and parenting classes. The respondent argues that, "[b]ecause the department did not offer [her] necessary services toward reunification and . . . [she] actively and appropriately engaged in the services the department did offer her, the trial court erred in determining [that she] was unable or unwilling to benefit from services."

This court has observed that, pursuant to § 17a-112 (j) (1), "[t]he [petitioner] must prove [by clear and convincing evidence] *either* that [the department] has made reasonable efforts to reunify or, *alternatively*, that the parent is unwilling or unable to benefit from the reunification efforts. Section 17a-112 (j) clearly provides that the [petitioner] is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Emphasis in original; internal quotation marks omitted.) *In re Corey C.*, 198 Conn. App. 41, 66, 232 A.3d 1237, cert. denied, 335 Conn. 930, 236 A.3d 217 (2020).

"[A]lthough it is true that a finding that the department made reasonable reunification efforts is not a necessary predicate to a finding that a parent is unable to benefit from such efforts, this does not mean that a trial court could never view those two issues as interrelated. . . . [T]he question of whether the [department] made reasonable efforts to reunify the respondent with her child is inextricably linked to the question of whether the respondent can benefit from such efforts. . . . Depending on the case, a trial court might well conclude that the department's reunification efforts were so lacking as to preclude both a finding that the

department made reasonable reunification efforts and that a parent is unable to benefit from such efforts. . . . However, the department is only required to prove *either* that it has made reasonable efforts to reunify or, *alternatively*, that the parent is unwilling or unable to benefit from reunification efforts. Section 17a-112 (j) clearly provides that the department is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Citations omitted; emphasis altered; internal quotation marks omitted.) *In re Cameron H.*, 219 Conn. App. 149, 161 n.5, 294 A.3d 50, cert. denied, 347 Conn. 903, 296 A.3d 171 (2023).

We review a trial court's reunification determinations for evidentiary sufficiency. See, e.g., *In re Oreoluwa O.*, 321 Conn. 523, 533, 139 A.3d 674 (2016); *In re Kyreese L.*, 220 Conn. App. 705, 716, 299 A.3d 296, cert. denied, 348 Conn. 901, 300 A.3d 1166 (2023). Pursuant to that standard, "we consider whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court. . . . We apply the identical standard of review to a trial court's determination that a parent is unable to benefit from reunification services. . . . That is, we review the trial court's ultimate determination that a respondent parent was unwilling or unable to benefit from reunification services for evidentiary sufficiency, and review the subordinate factual findings for clear error. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling. . . .

"In our review of the record for evidentiary sufficiency, we are mindful that, as a reviewing court, [w]e cannot retry the facts or pass upon the credibility of the witnesses. . . . Rather, [i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . Moreover, it is within the province of the trier of fact to accept or reject parts of the testimony of a single witness." (Citations omitted; internal quotation marks omitted.) *In re Gabriella A.*, 319 Conn. 775, 789–90, 127 A.3d 948 (2015).

The respondent does not challenge the correctness of any of the court's subordinate factual findings concerning the conduct of the department or the respondent in the present case. Instead, the respondent challenges the court's assessment of the degree to which she was receptive to and utilized the services offered as well as its ultimate determination that she was unable or unwilling to benefit from the department's services. Among the court's relevant subordinate findings was that, although the respondent had access to a cell phone while she was living in Guatemala, from mid-2019 to December, 2021, she had only "limited and intermittent contact" with the department. From December, 2021, through August, 2022, the respondent did not respond to communications, whether in the form of telephone calls or texts, from the department. The respondent's failure to let the department know of her whereabouts led to an inability of ISS-USA to conduct an updated home study in 2022. The respondent did not make the department aware of the fact that she intended to immigrate to the United States and did not contact the department in a timely manner when she arrived in New Haven on or about July 10, 2022. Rather, the respondent appeared, unannounced, at a supervised visit between Wendy and Santos in August, 2022.

The court found that, for several months, the respondent was very reluctant to engage with the services the department offered through IRIS. This finding was supported by the evidence that, although the department referred the respondent to IRIS in September, 2022, an agreed upon home visit did not occur until December, 2022. Moreover, the respondent did not fully share information about her living situation with IRIS, and it took until February, 2023, before IRIS workers could develop a working relationship with her.

In August, 2022, the respondent participated in a substance abuse evaluation as well as parenting services provided through IFP. The respondent also submitted to court-ordered psychological evaluation and a parent-child interactional study with Schiappa, a licensed psychologist, in January, 2023. The court relied on the detailed report prepared by Schiappa. Among her findings was that "[the respondent] did not appear to understand why Wendy couldn't just be returned to her care now that she is living in the United States. She does not appear to understand the impact that her behaviors have on her ability to safely parent the children." Schiappa stated that the respondent did not come prepared to the parent-child interactional study, as she had brought her younger daughter, Yeni, but did not bring anything with which to entertain her. She was indifferent to the fact that Yeni attempted to open a packet of medicine from her purse and that the evaluator ultimately had to intervene to prevent Yeni from ingesting the medicine. Schiappa opined that "[the respondent] does not appear to understand the differences in culture or recognize how her behaviors are impacting her ability to parent. [The respondent] minimizes any problems. She was cooperative to the evaluation process but has limited insight and judgment." Schiappa also opined that the respondent lacks "a good understanding of Wendy's needs or the capacity to meet them." She stated

that termination of the respondent's parental rights appears to be in Wendy's best interest, that her biological parents are unable to provide her with a stable and safe home, and that, "[g]iven the amount of time that has passed, it does not appear within an appropriate time frame [that the respondent will be able] to provide stability and permanency for Wendy." Schiappa observed that "[i]t would be impossible for [the respondent or Santos] to be [Wendy's] psychological parents as neither of them have ever really provided the care for her that a parent would. In Guatemala, [Wendy's] grandmother provided this care."

In its detailed findings, the court outlined the myriad efforts to reunify that were made by the department in this case despite the challenges posed by a global pandemic and the danger presented by the fact that the respondent was residing in Guatemala until July, 2022. Mindful of the importance of reunification efforts made by the department,[37] we conclude that the department's reunification efforts were on their face not so lacking as to preclude a finding that the respondent was unable or unwilling to benefit from such services.[38] The petitioner did not prove by clear and convincing evidence

[37] "The requirement of reunification efforts provides . . . substantive protection for any parent who contests a termination action, and places a concomitant burden on the state to take appropriate measures designed to secure reunification of parent and child. . . . This requirement is based on the well settled notion that [t]he right of a parent to raise his or her children [is] recognized as a basic constitutional right." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *In re Devon B.*, 264 Conn. 572, 584, 825 A.2d 127 (2003).

[38] Although it is unnecessary for us to reach the merits of the respondent's claim that the court improperly determined that the department made reasonable efforts to reunify her with Wendy, we nonetheless observe that "[t]he reasonableness of the department's efforts must be assessed in the context of each case. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . .

that the respondent failed to engage with *all* of the department's services, but such proof was not necessary. The petitioner demonstrated by clear and convincing evidence, and the court found, that the respondent had inconsistent communication with the department when she was in Guatemala, she failed to timely notify the department of her whereabouts prior to July, 2022, and she was reluctant to engage in services offered by the department until early 2023, which supported its finding that the respondent was unwilling to benefit from services offered by the department.

The respondent's failure to timely engage in services offered by the department detrimentally delayed her ability to gain critical and necessary knowledge of how Wendy's needs changed upon her immigration to an American city. The petitioner proved by clear and convincing evidence, and the court found, that, at the time of her evaluation by Schiappa, the respondent still demonstrated a lack of insight into Wendy's traumatic experiences resulting from her relocation to the United States, particularly her sexual abuse, and what was required for her to provide Wendy a safe, nurturing, and supportive environment free from insecurity. Affecting her ability to benefit from services was the fact that the respondent, who did not speak English and was undocumented, required community based services to meet even basic needs for food and shelter for herself and Yeni. Her inability to converse in English with Wendy was an obvious barrier to her being able to meet Wendy's psychological needs. The court also observed that the respondent struggled to parent Yeni, showing a lack of insight as to what was necessary to provide

---

[R]easonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case." (Internal quotation marks omitted.) *In re Omar I.*, 197 Conn. App. 499, 589, 231 A.3d 1196, cert. denied, 335 Conn. 924, 233 A.3d 1091, cert. denied sub nom. *Ammar I.* v. *Connecticut,* U.S.    , 141 S. Ct. 956, 208 L. Ed. 2d 494 (2020).

a safe environment for her, as well. The cumulative effect of these findings supported the court's ultimate determination that the respondent, due in part to her lack of understanding of what was required of her to nurture Wendy and her struggles to have basic needs met for herself and Yeni, was unable to benefit from reunification efforts made by the department.

The judgment is affirmed.

In this opinion the other judges concurred.